UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 18-14330-MER |
| WAY TO GROW, INC., | ) | |
| EIN: 90-1029102 | ) | Chapter 11 |
| | ) | |
|    Debtor. | ) | |
| | ) | |
| PURE AGROBUSINESS, INC., | ) | Case No. 18-14334-MER |
| EIN: 47-1002611 | ) | |
| | ) | Chapter 11 |
|    Debtor. | ) | |
| | ) | |
| GREEN DOOR AGRO, INC., | ) | Case No. 18-14333-MER |
| EIN: 27-0801379 | ) | |
| | ) | Chapter 11 |
|    Debtor. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| WAY TO GROW, INC., PURE AGROBUSINESS | ) | Adversary No. 18-    -MER |
| INC., AND GREEN DOOR AGRO, INC. | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COREY INNISS, JAMES BLAHA, BLUE | ) | |
| MOOSE, LLC and SUSAN INNISS | ) | |
| | ) | |
|    Defendants. | ) | |

## COMPLAINT

The Plaintiffs, Way To Grow, Inc. ("WTG"), Pure Agrobusiness, Inc. ("Pure"), and Green Door Agro, Inc. ("GDA"), by and through their attorneys Kutner Brinen, P.C., state their Complaint against the Defendants as follows:

## PARTIES, JURISDICTION AND VENUE

1.      The Plaintiffs are all debtors in possession having filed their bankruptcy cases under Chapter 11 of the Bankruptcy Code on May 18, 2018 in the Bankruptcy Court for the District of Colorado, proceeding under the lead Case No. 18-14330-MER ("Bankruptcy Case").

2.      Defendant, Corey Inniss ("Inniss"), is an individual who was prior to January 1, 2016 an owner of the entity now known as Way To Grow, Inc. and now claims to be a creditor of the Plaintiffs.

3.      Defendant, James Blaha ("Blaha"), is an individual who is the former step father of Inniss and was previously a director and officer of one or more of the Plaintiffs and is indirectly a landlord of one or more locations leased by the Plaintiff.

4.      Defendant, Blue Moose, LLC ("Blue") is a company that is believed to be owned and controlled by its Manager, Blaha.  Blue is the landlord to WTG under two leases.

5.      Defendant, Susan Inniss ("Susan"), is an individual who is the mother of Inniss and the former wife of Blaha.

6.      This action is brought pursuant to Rule 7001 *et seq.* of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 2201(a) to seek relief in accordance with 11 U.S.C. §§105, 502, 544, 548, 550, 551 and 1107 and other applicable law.

7.      This adversary proceeding arises out of and relates to the above-captioned Chapter 11 cases.

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter constitutes a "core" proceeding within the meaning of 28 U.S.C. §§ 157(b)(l) and 157(b)(2)(B), (H), (K) and (O). The Court has authority to enter final orders in this adversary proceeding and the Plaintiff consents to entry of final orders by the Bankruptcy Court.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a), as this adversary proceeding arises in or relates to a case under Title 11 of the United States Code, which is pending in this district.

## GENERAL BACKGROUND

10.     The Plaintiffs filed their voluntary petitions on May 18, 2018 ("Petition Date").

11.     The Plaintiff, Pure, is a company that was established to act as a holding company for one or more companies that engage in business in the hydroponics market.   Pure is the sole owner of both WTG and GDA.  Pure was formerly known as PUR Hydroponic Solutions, Inc.

2

12.     The Plaintiff, WTG, is a Colorado corporation engaged in business in Colorado as the owner of currently 7 retail stores that sell products related to hydroponic farming.

13.     The Plaintiff, GDA, is a Nevada corporation that is engaged in business in California also selling products related to hydroponic farming.

14.     Prior to January 2016, the predecessor to WTG was established by Inniss and was a successful business that sold hydroponic farming supplies and equipment to retail customers in Colorado.

15.     Inniss operated WTG through 7 retail locations in Colorado and 4 of the locations were in retail stores that were leased directly or indirectly from Blaha and Susan.

16.     Pure had retained a business broker to locate acquisition opportunities in the hydroponic market and the broker located WTG as a prospective acquisition.

17.     In May 2012, while Inniss owned and operated WTG, he was reportedly charged by federal authorities in federal court with the illegal distribution of at least 10 kilograms of marijuana.  It was reportedly alleged that Inniss had supplied lights and growing equipment from WTG stores to set up illegal marijuana growing operations in exchange for a share of the operation proceeds.   Inniss reportedly entered into a plea arrangement with the federal authorities.

18.     WTG was not charged with any crime or involved in the Inniss activity other than a report that approximately $1.3 million was deposited by Inniss into WTG accounts.

19.     As a result of the Inniss criminal disposition, it is believed that Inniss placed his step father Blaha in charge of the management of the WTG stores.

20.     Once WTG was identified to Pure as an acquisition, the negotiation between Pure, acting through its Director and officer, Rick Byrd, ("Byrd") and WTG was all handled on the part of WTG by Blaha.

**Acquisition of WTG by Pure**

21.     The negotiation for the acquisition of WTG by Pure resulted in a closing on the sale which occurred in Los Angeles, California on December 31, 2015 and documents were dated January 1, 2016.  The parties agreed that the closing of the merger was at 12:01 a.m. local time on January 1, 2016.

22.     The principal document executed at closing was the Amended and Restated Agreement and Plan of Merger and Reorganization by and among the acquiring entities and

3

Innis, dated January 1, 2016 ("Merger Agreement").   A copy of the Merger Agreement is attached hereto as Exhibit A.

23.     The Merger Agreement made clear in its final recital on page 2 that an Employment Agreement would be executed with a Key Employee who was Blaha.  A copy of the Employment Agreement is attached hereto as Exhibit B.  The Employment Agreement is dated December 30, 2015.

24.     In connection with the acquisition of WTG, stock in Pure was issued to Inniss in the amount of 9,868,940 shares, Blaha in the amount of 1,252,810 shares, and Susan in the amount of 833,250 shares.

25.     In addition, the Merger Agreement contained a so called Clawback Agreement which provided among other things that, "if the employment of James Blaha is terminated by Purchaser without Cause or by such employee for Good Reason…then, effective as of the date of such termination, the Clawback shall be of no further force or effect and the Payment Shares shall no longer be subject to forfeiture."  This provision essentially meant that if Blaha was terminated Pure could no longer claw back approximately 3,125,000 shares of Pure stock from Inniss.  The shares of Pure stock were provided to Inniss in connection with the acquisition of WTG by Pure.

26.     The Clawback was further defined in the Lock-Up Agreement and the Clawback Agreement which are attached hereto as Exhibits C and D respectively.

27.     The intent of the Blaha Employment Agreement, the Lock-Up Agreement and the Clawback Agreement was to make it extremely disadvantageous and financially harmful to Pure if it terminated the employment of Blaha.

28.     Pursuant to the terms of the Employment Agreement, Blaha was retained to be the President and Chief Executive Officer of Pure as of December 30, 2015.  Blaha was also one of the two members of the Pure Board of Directors.  Blaha was also the President of WTG.  Blaha was also made an officer of Pure months prior to the closing.

29.     Byrd was the other member of the Pure Board of Directors on the closing date and he served as the Chairman of the Board but he was not an officer of either Pure or its subsidiary WTG.

30.     In connection with the closing of the sale, Pure paid to Inniss the sum of approximately $2,500,000 in cash and executed a Secured Promissory Note in the amount of $22,500,000 ("Note").  A copy of the Note is attached hereto as Exhibit E.

31.     The Note was executed by Pure as the maker and below a paragraph following the provisions of the Note, a consent paragraph was signed by GDA and WTG.  While the consent provides that the two subsidiary entities consent and agree to the Note and to the payment of the amounts set forth in the Note, it does not provide that either entity grants to Inniss a security interest in their particular assets.  While the Note contains a purported grant of a security interest in the assets of Pure and the two subsidiaries, only Pure signed the Note.

**The Post Closing Misconduct and Unauthorized Transfers**

32.     Following the sale closing, the Plaintiffs were directed by Blaha to make payments each month under the Note to Inniss, Blaha, and to Susan in specific amounts as if they were all co-owners of the stock that had been sold to Pure.

33.     Blaha continued to manage the subsidiaries WTG and GDA following the merger as an officer and while he was on the Board of Directors of Pure and President and Chief Executive Officer of that company.

34.     The Plaintiffs learned subsequent to the closing that after the closing, Blaha and Inniss rewrote all of the leases for the retail lease locations that were entities of Blaha, such as Blue, and Susan (in each case the "Blaha Lease or Susan Lease").  In each case the leases were written for 10 year terms at rental rates that were 2 to 3 times higher than the prevailing market rates ("Excess Rent").  The Excess Rent approximated $50,000 or more each month that constituted a distribution to Blaha and Susan.  While the leases were set forth on the schedules to the parties Merger Agreement, copies of the leases were not provided and the terms were not disclosed.  The Blaha leases were written in the name of Blaha's company Blue as the landlord. It is believed that Blue is an alter ego of Blaha.

35.     The terms of the re-written leases were not disclosed to Pure or any other member of the Board of Directors and in many cases, if not all, the leases were signed on January 1, 2016 by Blaha or Susan on behalf of the landlord and by Inniss as CEO of WTG even though he did not hold that position and the stock was sold as a result of a closing that occurred on December 31, 2015 and was effective at 12:01 a.m. on January 1, 2016.

5

36.    It was not until approximately October 2017 that Blaha told Byrd that he was cash short in operating the WTG stores and needed more money.  As a result of this request, Byrd began a detailed examination of the WTG operations and discovered a number of inappropriate transactions.

37.    The WTG business was undergoing an audit in October 2017 with respect to the year 2016.  Byrd requested that the auditors examine some of the items he had identified as problematic. The auditors confirmed a number of questionable misappropriations and issues based upon the conduct of Blaha, Inniss, and Susan.  As a result the audit could not be completed and the Plaintiffs could not proceed with a very advantageous financing transaction.

38.    Following January 1, 2016, Blaha, Inniss, and Susan were responsible for the following transactions that wrongfully stripped funds from the Plaintiffs, none of which were approved by any of the Plaintiffs or their Boards of Directors, all occurred post- closing and all completely ignoring the fact that WTG had been sold:

a.  $358,000 was taken to pay Inniss an amount equal to his 2015 tax liability;

b.  $28,616.24 was taken to contribute to the WTG pension plan for Inniss for 2016 and additional sums were paid for 2017, all the while Inniss never worked for WTG during those years;

c.  $178,958.75 was paid by WTG on behalf of Blaha for the pension plan for 2016 and additional sums were paid for 2017, none of which were authorized. Blaha knew that the Board of Directors discussed discontinuing the pension plan in 2016 and he failed to take action as a Trustee of the pension plan, it was terminated January 1, 2017;

d.  $17,985.61 was paid by WTG on behalf of Susan for the pension plan for 2016 and additional sums were paid for 2017, she was not an employee and none of the payments were authorized. Additional pension plan underfundings from 2015 may have been funded by Blaha in later years with no authority to do so;

e.  $150,000 was paid to Inniss as a bonus for 2015, never authorized;

f.  $150,000 was paid to Blaha as a bonus for 2015, never authorized;

g.  $250,000 was paid to Blaha as a "transaction bonus" with respect to the acquisition of WTG by Pure, never authorized;

h. $36,000 per year paid to Susan along with health insurance and other benefits post closing for employment when she never actually worked for any of the Plaintiffs, all discovered in 2017;

i. $149,743 for pre-closing sales tax that Plaintiffs had to pay due to Blaha's failure to pay prior to closing. Blaha failed to pursue Inniss for recovery of the tax payment;

j. Bonuses of $100,000 paid to Blaha on January 11, 2016 and $150,000 paid to Blaha on July 15, 2016 which were unauthorized and no comparable bonus paid to the other director as required; and

k. All of the leases with Susan and Blaha and their entities had the effect of stripping cash from WTG far in excess of what a reasonable rent would have been for the subject rental locations.

39.     The closing on the sale occurred in Los Angeles, California at the offices of the Morgan Lewis law firm. Following the closing Blaha was to continue as an employee of Pure but he ignored his position with Pure and continued working on behalf of WTG. Blaha failed to turn over all bank accounts on a prompt basis and a final bank account was only located in February 2018 by WTG and Pure's auditors. The hidden account was apparently used by Blaha to fund loans and other benefits for himself and he never voluntarily disclosed it to Pure. Blaha also failed to turn over the keys, passwords and other information necessary for Pure to take control of WTG.

40.     Inniss, Blaha, and Susan at all times relevant operated in concert to strip the Plaintiffs of assets and cash which led to the inability of WTG to pay the Inniss Note. The payment default would allow Inniss to foreclose on all of the WTG assets as the secured lender and take back the company so he could try the whole procedure on another day with another victim.

## FIRST CLAIM FOR RELIEF
### (Declaratory relief as to the nature, extent, validity and priority of Inniss lien as to WTG and GDA)

41.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

42.     The Note is not executed by either WTG or GDA as the maker and the consent that was signed by each of them to the Note is limited.

43.     Neither WTG nor GDA granted a security interest in their assets to Inniss and as a result Inniss is unsecured as to the assets owned by WTG and GDA.

44.     A controversy exists between Inniss and WTG and GDA as to the lien claimed by Inniss, who claims a lien encumbering all assets of WTG and GDA.

WHEREFORE,  the Plaintiffs pray as hereinafter set forth.

## SECOND CLAIM FOR RELIEF
### (Avoidance of Inniss Note and security interest as a Fraudulent Conveyance as to WTG and GDA under 11 U.S.C. §544 and C.R.S. §38-8-101 *et seq.*)

45.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

46.     The Plaintiffs have the rights and powers of a trustee acting under the Bankruptcy Code.

47.     All of the obligations incurred by WTG and GDA with respect to the Note were made or incurred within the four years preceding the Petition Date and were for the benefit of Inniss.

48.     The Plaintiffs have the rights and power to avoid any transfer of property of the debtor or any obligation incurred by the Debtor/Plaintiffs that are voidable by a judgment lien creditor, an execution creditor, or a bona fide purchaser of real property.  11 U.S.C. §544(a).

49.     The obligations owed to Inniss by WTG and GDA and the security interests that secure the Note were made for the benefit of Inniss.  WTG and GDA received less than reasonably equivalent value in exchange for the obligations created by the Note and security agreement and such Plaintiffs: a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transactions; or b) intended to incur, or believed or reasonably should have believed that Plaintiffs would incur, debts beyond their ability to pay as they became due.  11 U.S.C. §544(a) and C.R.S. §38-8-105(1)(b)

50.     The obligations evidenced by the Note and security interest are fraudulent as to creditors since WTG and GDA incurred the obligation without receiving a reasonably equivalent

8

value in exchange for the transfer or obligation and the Plaintiff was insolvent at that time or became insolvent as a result of the obligation.  11 U.S.C. §544(a) and C.R.S. §38-8-106(1).

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

### THIRD CLAIM FOR RELIEF
**(Avoidance of fraudulent transfer of Excess Rent payments to Susan)**

51.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

52.     The Plaintiff WTG was party to two leases with Susan or entities owned and controlled by her with respect to rental locations in Lakewood, Colorado and Colorado Springs, Colorado, the Susan Leases.  A copy of the Lakewood lease is attached hereto as Exhibit F.

53.     The Lakewood lease was signed on January 1, 2016 after the closing on the sale of WTG to Pure.  Despite the closing and the sale of his company, Inniss signed the Lakewood lease on behalf of WTG.  Inniss had no authority to sign the lease for WTG.

54.     The Lakewood lease rental requires a rent payment approximately $11,000 per month over and above the market rate for comparable rents, for example, the monthly rent paid on this lease is $18,000 per month in 2018 and the comparable rate for equivalent space in a similar location is $7,000 per month.

55.     Susan was paid approximately $330,000 in fraudulent rent payments over the 30 months in which she has collected rent on the Lakewood location.  Similar circumstances exist in different amounts on the Colorado Springs lease.

56.     WTG did not receive equivalent value for the payments made to Susan on the Lakewood and Colorado Springs leases, and the obligations created by the such leases led to the WTG insolvency, or in the alternative WTG was engaged in a business for which the property remaining with WTG was unreasonably small in relation to the business, or alternatively WTG intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF
### (Avoidance of fraudulent transfer of Blaha Rent to Blaha and Blue Moose, LLC)

57.    The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

58.    The Plaintiff WTG was party to two leases with Blaha and/or Blue or entities owned and controlled by him with respect to rental locations in Fort Collins, Colorado and Boulder, Colorado, the Blaha Leases.  A copy of the Fort Collins lease is attached hereto as Exhibit G.

59.    The Blaha Leases were signed on January 1, 2016 after the closing on the sale of WTG to Pure.  Despite the closing and the sale of his company, Inniss signed the Blaha Leases on behalf of WTG.  Inniss had no authority to sign the leases for WTG.

60.    The Blaha Leases require rent payments that exceed the market rate for comparable rents.

61.    Blaha was paid approximately $500,000 in fraudulent rent payments over the 30 months in which he has collected rent on the Blaha Leases.

62.    WTG did not receive equivalent value for the payments made to Blaha on the Blaha Leases, and the obligations created by the such leases led to the WTG insolvency, or in the alternative WTG was engaged in a business for which the property remaining with WTG was unreasonably small in relation to the business, or alternatively WTG intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## FIFTH CLAIM FOR RELIEF
### (Avoidance of fraudulent transfer of payments to Blaha)

63.    The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

62.    During the period of time extending from January 1, 2016 until the Petition Date, Blaha caused to be made directly to himself or to others on his behalf, a number of payments including but not limited to, $650,000 in "bonuses", in excess of $178,958.75 in pension payments, and $149,743 in tax payments for a total of $978,701.75 (collectively "Blaha

Transfers") in distributions that were not authorized, not disclosed, and were fraudulent as to the Plaintiffs.

63.    Plaintiffs did not receive equivalent value for the payments made to Blaha with respect to the Blaha Transfers, and the Blaha Transfers led to the Plaintiffs insolvency, or in the alternative Plaintiffs were engaged in a business for which the property remaining with Plaintiffs was unreasonably small in relation to the business, or alternatively Plaintiffs intended to incur, or believed that it would incur, debts that would be beyond their ability to pay as the debts matured.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF
### (Avoidance of fraudulent transfer of payments to Inniss)

66.    The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

65.    During the period of time extending from January 1, 2016 until the Petition Date, Blaha and/or Inniss caused to be made directly to Inniss or to others on his behalf, a number of payments including but not limited to, $150,000 in "bonuses", in excess of $28,616.24 in pension payments for 2016, additional pension payments for 2017, 2015 sales tax payments that should have been paid back by Inniss, and $358,000 to Inniss to enable his tax payments for a total of $536,616.24 (collectively "Inniss Transfers") in distributions that were not authorized, not disclosed, and were fraudulent as to the Plaintiffs.

66.    Plaintiffs did not receive equivalent value for the payments made to Inniss with respect to the Inniss Transfers, and the Inniss Transfers led to the Plaintiffs insolvency, or in the alternative Plaintiffs were engaged in a business for which the property remaining with Plaintiffs was unreasonably small in relation to the business, or alternatively Plaintiffs intended to incur, or believed that it would incur, debts that would be beyond their ability to pay as the debts matured.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF
### (Avoidance of fraudulent transfer of payments to Susan)

67.    The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

68.     During the period of time extending from January 1, 2016 until the Petition Date, Blaha caused to be made directly to Susan or to others on her behalf, a number of payments including but not limited to, $36,000 per year in "salary" that was paid for no activity on her part totaling at least $84,000 and $17,985.61 in pension payments for a total of $101,985 (collectively "Susan Transfers") in distributions that were not authorized, not disclosed, and were fraudulent as to the Plaintiffs.

69.     Plaintiffs did not receive equivalent value for the payments made to Susan with respect to the Susan Transfers, and the Susan Transfers led to the Plaintiffs insolvency, or in the alternative Plaintiffs were engaged in a business for which the property remaining with Plaintiffs was unreasonably small in relation to the business, or alternatively Plaintiffs intended to incur, or believed that it would incur, debts that would be beyond their ability to pay as the debts matured.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

### EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty as to Blaha and Inniss)

70.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

71.     During the time period extending from January 1, 2016 through the year 2017, both Blaha and Inniss owed fiduciary duties to Pure and WTG.  In the case of Blaha, he was retained by Pure months in advance of the merger.  Both Blaha and Inniss were, in the case of Blaha director and officer of both entities and in the case of Inniss a former owner, officer, and director of WTG and a material shareholder in Pure.  Both individuals held themselves out as owners, officers, and directors of the companies.  Blaha was during this time period the only material officer of both companies.

72.     Blaha and Inniss owed fiduciary duties of loyalty, care and good faith to Pure and WTG, and the shareholders of Pure.

73.     Both Blaha and Inniss participated in a number of the breaches of fiduciary duty set forth herein such as the execution of new retail store leases for WTG on January 1, 2016 for the sole benefit of Blaha and Inniss's mother Susan when neither person had authority to do so, the payment of salary to Inniss and Susan and so-called bonus payments to Blaha, Inniss and Susan when they were neither earned nor authorized, the payment of tax payments, and the

12

payment of pension plan payments and other corporate benefits to Blaha, Inniss and Susan when they were neither earned nor authorized.

74.     All of the diverted funds described herein went to the direct benefit of Blaha, Inniss, and Susan at the detriment of Pure and WTG.  Such transfers left each of Pure and WTG with a greatly diminished ability to operate its business and make payments on the Note.

75.     The direct result of the transfers described herein was harm to Pure and WTG and Blaha, Inniss and Susan should be held accountable and repay such funds.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## NINTH CLAIM FOR RELIEF
### (Conversion of funds as to all Defendants)

76.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

77.     The Defendants asserted and acted as if they were authorized rights and control over property owned by the Plaintiffs, Pure and WTG.

78.     The Defendants had no right or authorization to exercise such rights and control over the Plaintiffs' property, namely cash and corporate property.

79.     The Plaintiffs, Pure and WTG, had the right to the use and control of the funds converted by the Defendants at the time of conversion.

80.     In several cases, Pure and WTG demanded the turnover of funds, bank accounts, and other assets however Blaha and Inniss delayed and refused to turn over the assets and property.

81.     The damages to the Plaintiffs include all of the funds converted by the Defendants plus interest from the date of conversion.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## TENTH CLAIM FOR RELIEF
### (Fraudulent transfer of Blaha and Susan Leases)

82.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

13

83.     On January 1, 2016 the Blaha and Susan Leases were executed by and between Blaha and Susan or entities they owned and controlled and Inniss purportedly on behalf of WTG. Inniss had no authority at all to execute the Blaha and Susan Leases on behalf of WTG and Blaha and Susan were aware of that fact.

84.     The Blaha and Susan Leases had the effect of transferring substantial money from WTG, far in excess of the fair rental value of the properties for which the rent was being paid.

85.     While the Blaha and Susan Leases were executed on January 1, 2016, the Board of Directors of Pure the new owner of WTG as never consulted about the new leases, the excess rent called for under the leases and the extended term of the leases.

86.     Since Blaha was an officer and director of Pure, Blaha would have had a fiduciary duty to require such leases to be on market rates and terms.  Blaha had prior to closing represented to Byrd that the leases were all at market rates.

87.     The Plaintiffs did not receive equivalent value for the obligations incurred under the Susan and Blaha Leases, and the Susan and Blaha Leases led to the Plaintiffs insolvency, or in the alternative Plaintiffs were engaged in a business for which the property remaining with Plaintiffs was unreasonably small in relation to the business, or alternatively Plaintiffs intended to incur, or believed that it would incur, debts that would be beyond their ability to pay as the debts matured.

88.     The Blaha and Susan Leases should be avoided and Blaha, Susan, and Inniss should be required to repay the Plaintiff WTG for all funds paid to Blaha and Susan on such leases over and above fair rental value of the underlying properties.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.


### ELEVENTH CLAIM FOR RELIEF
### (Disallowance of claim under 11 U.S.C. §502)

89.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

90.     All Defendants have received transfers from the Plaintiffs that are subject to avoidance as set forth herein.

91.     None of the Defendants have repaid or transferred back to the Plaintiffs the money or property that is subject to avoidance.

14

92.     Pursuant to 11 U.S.C.§502(d) any claim held by any of the Defendants should be disallowed.

WHEREFORE, the Plaintiffs pray as hereinafter set forth.

## TWELTH CLAIM FOR RELIEF
### (Subordination of Defendants' claims)

93.     The Plaintiffs restate herein each and every allegation contained in the foregoing paragraphs of this Complaint.

94.     The conduct of the Defendants which is set forth herein is inequitable as to the Plaintiffs and includes fraud, misrepresentations, unauthorized use of corporate funds, misappropriation of assets, breaches of fiduciary duty and unfair conduct along with culpability for the actions they took with respect to the Plaintiffs.

95.     The Defendants are all insiders with respect to the Plaintiffs at the time of their wrongful conduct as set forth herein.

96.     Blaha acted as an agent on behalf of the Plaintiffs, Pure and WTG, during the time period involving the activities set forth herein and at all such times he was working in concert with Inniss and Susan.  At all such times the Defendants took advantage of the Plaintiffs, ignored the Plaintiffs' corporate structure, and transferred assets for their own benefit to the detriment of the Plaintiffs.

97.     Pursuant to 11 U.S.C. §510(c)(1) the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another claim owed by the Plaintiffs.

98.     The claims of the Defendants should be subordinated to the allowed unsecured creditors of each of the Plaintiffs and the interests of each of the Plaintiffs.

99.     Pursuant to 11 U.S.C. §510(c)(2) the Court should transfer to the estate the lien held by Inniss which secures his claim.

WHEREFORE, Plaintiffs pray that the Court make and enter judgment in favor of the Plaintiffs:

a) declaring that the Inniss note is not enforceable as to WTG and GDA and that neither WTG nor GDA pledged their assets to secure the Inniss Note;

15

b) avoiding any obligation and any security interest owing to Inniss by WTG and GDA in this case as a fraudulent conveyance under applicable federal and state law;

c) avoiding the transfer of all rent payments made to Blaha, Blue, and Susan over and above the fair rental value of the properties leased to WTG, the Excess Rent, in an amount to be proven at trial;

c) avoid any fraudulent or otherwise avoidable transfers made to the Defendants during the time extending from January 1, 2016 until the Petition Date for recovery for the benefit of the estate;

d) enter judgment against all Defendants in an amount to be proved at trial for breach of their fiduciary duties owed to the Plaintiffs;

e) enter judgment against all Defendants in an amount to be proved at trial equal to the amount of funds and property converted from the Plaintiffs plus interest thereon;

f) avoid all obligations arising under the Blaha, Blue, and Susan Leases as fraudulent conveyances;

g) disallow all claims held by the Defendants under 11 U.S.C. §502(d);

h) subordinate to the claims of all creditors and the equity of interest holders the claims of the Defendants and in the case of Inniss transfer his liens to the estates; and

i) for such further and additional relief as to the Court may appear proper.

Dated: June 27, 2018                        Respectfully submitted,


                                            By:   /s/ Lee M. Kutner
                                                  Lee M. Kutner, #10966

                                            **KUTNER BRINEN, P.C.**
                                            1660 Lincoln Street, Suite 1850
                                            Denver, CO 80264
                                            Telephone: (303) 832-2400
                                            Telecopy: (303) 832-1510
                                            E-Mail: lmk@kutnerlaw.com

                                            COUNSEL FOR THE PLAINTIFFS

# EXHIBIT A

**AMENDED AND RESTATED**

**AGREEMENT AND PLAN OF MERGER AND REORGANIZATION**

**BY AND AMONG**

**PUR HYDROPONIC SOLUTIONS, INC.,**

**PUR MERGER SUB 1, INC.,**

**PUR MERGER SUB 2, INC.,**

**WAY TO GROW, INC.**

**and**

**COREY INNISS**

**JANUARY 1, 2016**

**AMENDED AND RESTATED**

**AGREEMENT AND PLAN OF MERGER AND REORGANIZATION**

THIS AMENDED AND RESTATED AGREEMENT AND PLAN OF MERGER AND REORGANIZATION (this "Agreement"), dated as of January 1, 2016, is entered into by and among PUR HYDROPONIC SOLUTIONS, INC., a Nevada corporation ("Purchaser"), PUR MERGER SUB 1, INC., a Nevada corporation and a wholly owned subsidiary of Purchaser ("PSub1"), PUR MERGER SUB 2, INC., a Nevada corporation and a wholly owned subsidiary of Purchaser ("PSub2"), WAY TO GROW, INC., a Colorado corporation ("Way to Grow" or the "Company"), and COREY INNISS ("Seller").

RECITALS

WHEREAS, on October 22, 2015, each of Purchaser, PSub1, PSub2, Way to Grow and Seller entered into an Agreement and Plan of Merger and Reorganization (the "Original Agreement");

WHEREAS, the parties have agreed to modify terms of the Original Agreement and to amend and restate the Original Agreement in its entirety and to replace the Original Agreement with this Agreement;

WHEREAS, there are currently 100 shares of Way to Grow common stock issued and outstanding (the "Way to Grow Common Stock").

WHEREAS, Seller owns all of the issued and outstanding Way to Grow Common Stock.

WHEREAS, Way to Grow operates a number of retail stores selling a wide variety of hydroponic supplies and equipment, including but not limited to magnetic ballasts, cultivation tents, digital atmospheric controllers and recycling timers, as well as a wide range of nutrient solutions (the "Business").

WHEREAS, Purchaser and PSub1 and the board of directors of Way to Grow (the "Way to Grow Board of Directors") deem it advisable and in the best interests of each corporation and its respective stockholders that Purchaser and Way to Grow engage in a business combination transaction as contemplated by this Agreement.

WHEREAS, Purchaser, PSub1 and Way to Grow intend to effect a merger of PSub1 with and into Way to Grow (the "First Merger") upon the terms and subject to the conditions of this Agreement and in accordance with the Colorado Corporations and Associations Act (the "CCAA"). Upon consummation of the First Merger, PSub1 will cease to exist, and Way to Grow will continue as a wholly owned subsidiary of Purchaser.

WHEREAS, on the Closing Date immediately after the First Merger, Purchaser, PSub2 and Way to Grow intend to effect a merger of Way to Grow within and into Psub2 (the "Second Merger" and, together with the First Merger, the "Mergers") upon the terms and subject to the conditions of this Agreement and in accordance with the CCAA. Upon consummation of the Second Merger, Way to Grow will cease to exist, and PSub2 will continue as a wholly owned subsidiary of Purchaser.

WHEREAS, Purchaser and Way to Grow intend, by executing this Agreement, that the First Merger and the Second Merger are integrated steps in a single transaction and together will qualify as a tax-free reorganization within the meaning of Section 368 of the Code.

WHEREAS, this Agreement has been approved by Purchaser, PSub1, PSub2 and the Way to Grow Board of Directors.

WHEREAS, contemporaneously with the execution and delivery of this Agreement, and as a condition and inducement to Purchaser's willingness to enter into this Agreement, each of the individuals identified on Exhibit A (the "Key Employees") is entering into an employment agreement with Purchaser in the form attached hereto as Exhibit B (an "Employment Agreement").

AGREEMENT

NOW, THEREFORE, intending to be legally bound, the parties to this Agreement hereby agree as follows:

1.

**Definitions**

**1.1.    Definitions**.

(a)    As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.  For purposes of this definition, "control," when used with respect to any specified person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have correlative meanings to the foregoing.

1."Aggregate Consideration" means (a) the Cash Payment; plus (b) the Seller Note; plus (c) the Payment Shares, subject to the Clawback; minus (c) the amount of any Way to Grow Transaction Expenses.

"Applicable Law" means, with respect to any Person, any federal, state, common, local, municipal, foreign or other law, constitution, treaty, convention, ordinance, code, rule, circular, guidance notes, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Balance Sheet Date" means December 31, 2014.

"Business Day" means a day, other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Cash Payment" means payment of Two Million Five Hundred Thousand United States Dollars (US$2,500,000) in cash to Seller upon the execution hereof.

"Clawback" means (i) if, on the first anniversary of the date of the Closing, the Purchaser's revenues attributable to the Business acquired from Seller for the 12-month period ending on the last day of the month preceding the date of such first anniversary ("WTG Year 1 Revenues") are less than 90% of Way to Grow's revenues for the 12-month period ending on the last day of the month preceding the date hereof (using the same methodology in each instance), then 3,125,000 of the Payment Shares shall be forfeited, and cancelled by Purchaser, as soon as practicable following the determination of the WTG Year 1 Revenues and the comparison; and (ii) if, on the second anniversary of the date of the date hereof, the Purchaser's revenues attributable to the business acquired from Seller for the 12-month period ending on

2

the last day of the month preceding the date of such second anniversary ("WTG Year 2 Revenues") are less than 90% of Way to Grow's revenues for the 12-month period ending on the last day of the month preceding the date hereof (using the same methodology in each instance), then 3,125,000 of the Payment Shares shall be forfeited, and cancelled by Purchaser, as soon as practicable following the determination of the WTG Year 2 Revenues and the comparison; *provided, however*, if the employment of James Blaha is terminated by Purchaser without Cause or by such employee for Good Reason (as such terms are defined in the Employment Agreement(s)), then, effective as of the date of such termination, the Clawback shall be of no further force or effect and the Payment Shares shall no longer be subject to forfeiture.

"Closing Indebtedness" means the aggregate principal amount of, and accrued interest on, all Indebtedness of Way to Grow as of the close of business on the day immediately preceding the Closing Date.

"Code" means the United States Internal Revenue Code of 1986.

"Consent" means any approval, consent, ratification, permission, waiver or authorization (including any Permit).

"Contract" means any contract, agreement, indenture, note, bond, loan, license, instrument, lease, commitment, plan or other arrangement, whether oral or written.

"Copyrights" means (i) mask work rights, registrations and applications for registration thereof throughout the world and (ii) copyrights in works of authorship of any type, registrations and applications for registration thereof throughout the world, all rights therein provided by international treaties and conventions, all moral and common-law rights thereto, and all other rights associated therewith.

"Damages" include any loss, damage, injury, lost opportunity, liability, claim, demand, settlement, judgment, award, fine, penalty, Tax, fee (including reasonable attorneys' fees), charge, cost (including reasonable costs of investigation) or expense of any nature (including reasonable costs of investigation and any fees, charges, costs and expenses associated with any Proceeding commenced by any Indemnitee for the purpose of enforcing any of its rights under Article 9), but excluding punitive Damages other than as owed to a third party. For the avoidance of doubt, "Damages" will not include any losses attributable to the decline in the trading price of the Purchaser's common stock.

"Disclosure Schedule" means the disclosure schedule regarding this Agreement that has been provided by Seller and Way to Grow to Purchaser and dated the date of this Agreement.

"Employee" means any employee of Way to Grow.

"Environmental Laws" means any Applicable Law or any agreement with any Governmental Authority or other Person, relating to human health and safety, the environment or to Hazardous Substances.

"Environmental Permits" means all permits, licenses, franchises, certificates, approvals, notifications, allowances, credits, waivers, exemptions and other similar authorizations of Governmental Authorities relating to or required by Environmental Laws and affecting, or relating in any way to, the business of Way to Grow as currently conducted.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

3

"Foreground IP" means all Intellectual Property Rights developed, conceived, or created by Way to Grow specifically to meet the requirement of a Contract to which Way to Grow is a party that are incorporated into a Way to Grow Product, and that are assigned to a third party.

"Former Employee" means any person who was previously an Employee.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.01, 3.02, 3.05, 3.18, 3.23, 3.24, 4.01, 4.02, 4.05, 4.08 and 4.09.

"Generally Available Software" means "off-the-shelf" or "shrink-wrapped" software that (i) is licensed to Way to Grow solely in executable or object code form pursuant to a nonexclusive, internal use software license; (ii) is not incorporated into, or used directly in the development, manufacturing, or distribution of Way to Grow's products or services; and (iii) is generally commercially available to any licensee on standard terms.

"Governmental Authority" means any: (i) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign or other government; or (iii) governmental or quasigovernmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or Person and any court or other tribunal and including any arbitrator and arbitration panel).

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including petroleum, its derivatives, by-products and other hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Indebtedness" means, without duplication, any liability or obligation of a Person for any amount owed (including (a) unpaid interest, (b) premium thereon, (c) any Prepayment Penalties and (d) any payments or premiums attributable to, or which arise as a result of, a change of control of such Person or any Affiliate of such Person) in respect of (i) borrowed money, (ii) capitalized lease obligations, (iii) obligations for the reimbursement of any obligor for amounts drawn on any letter of credit, banker's acceptance or similar transaction, (iv) obligations for the deferred purchase price of property or services (other than current liabilities for such property or services incurred in the ordinary course of business, but including milestone payments and other types of earnouts or contingent payments due for the acquisition of capital stock or assets of another Person), (v) any obligations with respect to any factoring programs, and (vi) any liability or obligation of the type described in clauses "(i)" through "(v)" guaranteed by such Person, that is recourse to such Person or any of its assets or that is otherwise its legal liability or that is secured in whole or in part by the assets of such Person; provided, however, that notwithstanding the foregoing, Indebtedness shall not be deemed to include any accounts payable recorded as a current liability and incurred in the ordinary course of business or any obligations under undrawn letters of credit.

"Indemnitees" mean the following Persons, as applicable: (i) Purchaser; (ii) Purchaser's current and future Affiliates; (iii) Seller; (iv) Seller's current and future Affiliates; (v) the respective Representatives of the Persons referred to in clauses "(i)", "(ii)", "(iii)", and "(iv)" above; and (vi) if permitted, the respective successors and assigns of the Persons referred to in clauses "(i)," "(ii)", "(iii)", "(iv)", "(v)" above.

"Intellectual Property Rights" means and includes any and all of the rights in or associated with the following throughout the world: (i) Patents, (ii) Trademarks, (iii) Copyrights, (iv) Trade Secrets (v) rights in databases and data collections (including knowledge databases, customer lists and customer databases), whether registered or unregistered, (vi) inventions (whether or not patentable) and

4

improvements thereto, (vii) all claims and causes of action arising out of or related to infringement or misappropriation by any of the foregoing, and (viii) any other similar, corresponding or equivalent proprietary or intellectual property rights now known or hereafter recognized throughout the world.

"Knowledge of Purchaser" means the actual knowledge of Richard Byrd, Brian Williams, Christopher Scott and Robert Donovan, and the knowledge that such individual(s) obtained in the course of the performance of their respective duties on behalf of Purchaser, as applicable

"Knowledge of Seller" means the actual knowledge of Corey Inniss and/or James Blaha, and the knowledge that such individual(s) obtained in the course of the performance of their respective duties on behalf of Way to Grow, as applicable.

"Lockup Agreement" means the lockup agreement substantially in the form attached hereto as Exhibit G.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset. For purposes of this Agreement, a Person shall be deemed to own subject to a Lien any property or asset that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"Malicious Code" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

"Material Adverse Effect" means any event, change, development or state of facts (each an "Effect") that is or would reasonably be expected to be materially adverse to the business, assets, liabilities, operations or financial condition of Way to Grow, taken as a whole; provided, however, that no event, change, development or state of facts (i) relating to the United States or foreign economies or securities or financial markets in general, (ii) arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether arising before, on or after the date hereof, or (iii) resulting from any change in Applicable Law or in US GAAP, shall be deemed in themselves to constitute a Material Adverse Effect; provided further, however, that, in the case of clauses (i), (ii) or (iii), to the extent such Effects, individually or in the aggregate, have a disproportionate impact on Way to Grow relative to other Persons in similar businesses, such Effects shall, in each case, be deemed in themselves, to constitute a Material Adverse Effect.

"Open Source Software" means any Software licensed, provided, or distributed under any open-source or similar license, or that is otherwise subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license) to a third party that requires or conditions the use or distribution of such Software on, (i) the disclosure, licensing, or distribution of any source code for such Software, or (ii) the granting to licensees of the right to make derivative works or other modifications to such Software.

"Organizational Documents" means, with respect to any Person other than a natural Person, the documents (i) by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership, articles of incorporation or articles, organization, certificate of formation, memorandum or association or articles of association, and including, without limitation, any certificates

of designation for preferred stock or other forms of preferred equity), and all amendments thereto, (ii) which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement (but shall not include any stockholders agreement relating to such Person)), and all amendments thereto, and (iii) which serve as equivalent constituent documents as those set forth in clause (i) or (ii) in any foreign jurisdiction.

"Original Principal Amount" means $22,500,000.

"Patents" means patents and statutory invention registrations and disclosures relating thereto, in any jurisdiction worldwide, and all rights therein provided by international treaties and conventions.

"Payment Shares" means 12,500,000 shares of Purchaser's common stock, par value $0.001.

"Pension Benefits" means any pension, superannuation, or retirement (including on early retirement) benefits (including in the form of a lump sum).

"Pension Plans" means the stakeholder pension plans provided by National Pension Partners offered by Way to Grow to Employees.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Personal Data" means a natural person's name, street address, telephone number, e-mail address, photograph, social security number or tax identification number, driver's license number, passport number, credit card number, bank account information and other financial information, customer or account numbers, account access codes and passwords, or any other piece of information that allows the identification of such natural person or enables access to such person's financial information.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Prepayment Penalties" means any prepayment penalties, breakage costs, fees, expenses or similar charges arising as a result of the discharge of any Indebtedness.

"Proceeding" means any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority or any arbitrator or arbitration panel.

"Qualified Event" means the first to occur of the following: (i) the date on which the Purchaser closes on an equity financing in an amount that is not less than $40,000,000; and (ii) December 31, 2016.

"Registered IP" means all Intellectual Property Rights that are registered, filed, or issued under the authority of any Governmental Authority, including all Patents, registered Copyrights, registered Trademarks, registered databases, and domain names and all pending applications for any of the foregoing.

"Representatives" means a Person's officers, directors, employees, agents, attorneys, accountants, advisors and other authorized representatives.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Seller Note" means that secured promissory note issued by Purchaser in favor of Seller in the Original Principal Amount in the form attached hereto as Exhibit F, to be paid upon a Qualified Event.

"Software" means computer software, programs, and databases in any form, including source code, object code, operating systems and specifications, data, databases, database management code, tools, developers kits, utilities, graphical user interfaces, menus, images, icons, forms and software engines, and all versions, updates, corrections, enhancements and modifications thereof, and all related documentation, developer notes, comments, and annotations.

"Straddle Period" means any period beginning before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"Tax" means any and all taxes, including (i) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, registration, recording, documentary, conveyancing, gains, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit, custom duty, governmental fee or other like assessment or charge of any kind whatsoever in the nature of a tax, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (United States (federal, state or local) or foreign), (ii) in the case of Way to Grow, any liability for the payment of any amount described in clause (i) as a result of being or having been before the Closing Date a member of an affiliated, consolidated, combined or unitary group, and (iii) liability for the payment of any amounts of the type described in clause (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, report, declaration, claim for refund, information return or other document (including schedules thereto, other attachments thereto, amendments thereof, or any related or supporting information) filed or required to be filed with any taxing authority in connection with the determination, assessment or collection of any Tax, or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Technology" means and includes embodiments and implementations of Intellectual Property Rights, whether in electronic, written or other media, including Software, design and manufacturing schematics, bills of material, build instructions, test reports, algorithms, user interfaces, routines, formulae, test vectors, IP cores, net lists, photomasks, databases, data collections, diagrams, recipes, manufacturing process technology, network configurations and architectures, proprietary technical information, protocols, layout rules, packaging and other specifications, techniques, interfaces, verification tools, works or authorship, lab notebooks, development and lab equipment, know-how, inventions and invention disclosures, and all other forms of technology, in each case whether or not registered with a Governmental Authority or embodied in any tangible form.

"Third Party IP" means all Intellectual Property Rights and Technology owned by third parties, including Third Party Software, that is either (i) licensed, offered or provided by Way to Grow to customers of Way to Grow as part of or in conjunction with any Way to Grow Product, or (ii) otherwise used by Way to Grow or its Affiliates in connection with the Business.

"Third Party Software" means all Software (excluding Generally Available Software) owned by third parties, including Affiliates of Way to Grow Way to Grow that is either (i) licensed, offered or provided to customers of Way to Grow as part of or in conjunction with any Way to Grow Product, or (ii) otherwise used by Way to Grow or its Affiliates in connection with the Business.

7

"Trademarks" means trademarks, service marks, service names, trade dress, logos, trade names, corporate names, business names, slogans, URL addresses, Internet domain names and other indicia of source or origin, including the goodwill of the business symbolized thereby or associated therewith, all common-law rights thereto, registrations and applications for registration thereof throughout the world, and all rights therein provided by international treaties and conventions.

"Trade Secrets" means all rights in any jurisdiction in know-how and other confidential or proprietary technical, business, and other know-how and information, including confidential or proprietary manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, bills of material, financial, marketing, and business data, pricing and cost information, business and marketing plans, customer and supplier lists and other similar information.

"Transaction" means the transactions contemplated by this Agreement.

"Way to Grow IP" means all Intellectual Property Rights and Technology owned or purported to be owned by Way to Grow.

"Way to Grow Products" means all of the (a) products or Software that Way to Grow (i) currently owns, develops, manufactures, markets, distributes, sells, licenses, or otherwise makes available to third parties, or (ii) has owned, developed, manufactured, marketed, distributed, sold, licensed or otherwise made available to third parties since inception, and (b) services that Way to Grow (i) currently provides, licenses or otherwise makes available to third parties, or (ii) has provided, licensed or otherwise made available to third parties since inception.

"Way to Grow Proprietary Software" means Software owned or purported to be owned by Way to Grow or its Affiliates and used in, held for use in, or related to the conduct of the Business.

"Way to Grow Real Property" means the Owned Real Property and the Leased Real Property.

"Way to Grow Transaction Expenses" means, to the extent unpaid at Closing, (i) any fees and disbursements incurred by or on behalf of Way to Grow and payable to any financial advisor, investment banker, broker or finder in connection with the Transaction; (ii) the fees and disbursements payable to legal counsel or accountants of Way to Grow that are payable by Way to Grow in connection with the Transaction; (iii) any bonuses, severance, termination payments or other change-in-control or other transaction-related payments payable to any director, officer, employee or other service provider of Way to Grow in connection with the Transaction and, to the extent not already taken into account in this clause (iii), any payroll taxes incurred or to be incurred by Way to Grow in connection therewith; and (iv) all other miscellaneous out-of-pocket expenses or costs, in each case, incurred by Way to Grow in connection with the Transaction.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Amended and Restated Certificate of Incorporation | 2.04(a) |
| Anti-Corruption Law | 3.10(c)(iii) |
| Audit | 6.05 |
| Business | Recitals |

8

| Term | Section |
|------|---------|
| Claim | 9.05 |
| Claim Dispute Notice | 9.04(b) |
| Closing | 2.01(a) |
| Closing Date | 2.01(a) |
| CCAA | Preamble |
| Deductible | 9.03(a) |
| Effective Time | 2.03 |
| Employment Agreement | Recitals |
| Employment Dispute | 3.19(g) |
| Escrow Agreement | 8.02(f)(i) |
| Export and Sanctions Laws | 3.10(b) |
| Expiration Date | 9.01(a) |
| Financial Statements | 3.06(a) |
| First Merger | Preamble |
| First Merger Certificate of Merger | 2.03 |
| First Merger Effective Time | 2.03 |
| First Merger Surviving Entity | 2.01(b) |
| Invoice | 5.01 |
| IT Systems | 3.15 |
| Key Employees | Recitals |
| Leased Real Property | 3.12 |
| Lien Release | 5.01 |
| Material Contract | 3.09(a) |
| OFAC | 3.10(b) |
| Officer's Claim Certificate | 9.04(a) |
| Owned Real Property | 3.12 |
| Payoff Letter | 5.01 |
| Permits | 3.17 |
| Permitted Liens | 3.13(a)(iv) |
| Pre-Closing Return | 7.04 |

9

| Term | Section |
|------|---------|
| PSub1 Common Stock | 2.05 |
| Purchaser | Preamble |
| Purchaser Cap Limitation | 10.03(e) |
| Purchaser Closing Certificate | 8.03(c)(ii) |
| Real Property Lease | 3.12 |
| Related Person | 3.23 |
| Second Merger Certificate of Merger | 2.03 |
| Second Merger Effective Time | 2.03 |
| Seller Cap Limitation | 9.03(d) |
| Seller Closing Certificate | 8.02(f)(v) |
| Surviving Entity | 2.01(c) |
| Tax Contest | 7.04 |
| Unaudited Year End Balance Sheet | 3.06(a) |
| Way to Grow | Preamble |
| Way to Grow Board of Directors | Recitals |
| Way to Grow Board Recommendation | 3.02(b) |
| Way to Grow Common Stock | Recitals |
| Way to Grow Real Property | 3.12 |

## 1.2.    Definitional and Interpretative Provisions.

(a)      The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)      The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.   References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.

(c)      All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.

(d)      Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

10

(e)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

(f)     The use of the word "or" shall not be exclusive.

(g)     The word "will" shall be construed to have the same meaning and effect as the word "shall."

(h)     The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's successors and permitted assigns.

(i)     A reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

(j)     Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.   No prior draft of this Agreement nor any course of performance or course of dealing shall be used in the interpretation or construction of this Agreement.   No parole evidence shall be introduced in the construction or interpretation of this Agreement unless the ambiguity or uncertainty in issue is plainly discernable from a reading of this Agreement without consideration of any extrinsic evidence.  Although the same or similar subject matters may be addressed in different provisions of this Agreement, the parties intend that, except as reasonably apparent on the face of the Agreement or as expressly provided in this Agreement, each such provision shall be read separately, be given independent significance and not be construed as limiting any other provision of this Agreement (whether or not more general or more specific in scope, substance or content). The doctrine of election of remedies shall not apply in constructing or interpreting the remedies provisions of this Agreement or the equitable power of a court considering this Agreement or the Transaction.

(k)     Any statement in this Agreement to the effect that any information, document or other material has been "made available" to Purchaser or any of its Representatives means that such information, document or other material was (i) posted to the electronic data room hosted by or on behalf of Way to Grow in connection with the Transaction (and made available on a continuous basis for review therein by Purchaser and its Representatives) no later than 12:01 a.m., Eastern Time, on the date that is three Business Days prior to the date of this Agreement, or (ii) made available to Purchaser and its Representatives for review on location at Way to Grow's facilities.

2.

## Description of the Transaction

### 2.1.    The Closing; The Mergers.

(a)     <u>The Closing</u>. The consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Lucosky Brookman LLP, 101 Wood Avenue South, 5th Floor, Iselin, NJ 08830 at 12:01 a.m. local time on January 1, 2016, or at such other time, date and location as the parties hereto agree; provided, however, to the extent Purchaser and Seller so agree, documents may be delivered and exchanged at the Closing by facsimile, PDF, or other electronic means in lieu of an in-person closing.  The date on which the Closing actually takes place is referred to in this Agreement as the "<u>Closing Date</u>."

11

(b)    <u>The First Merger</u>.    Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, PSub1 shall be merged with and into Way to Grow, the separate existence of PSub1 shall cease, and Way to Grow will continue as the surviving corporation in the First Merger (the "<u>First Merger Surviving Entity</u>").   The First Merger shall have the effects set forth in this Agreement and in the applicable provisions of the CCAA.

(c)    <u>The Second Merger</u>.    Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date immediately after the consummation of the First Merger, the First Merger Surviving Entity shall be merged with and into PSub2, the separate existence of First Merger Surviving Entity shall cease, and PSub2 will continue as the surviving corporation in the Second Merger (the "<u>Surviving Entity</u>").   The Second Merger shall have the effects set forth in this Agreement and in the applicable provisions of the CCAA.

**2.2.    Closing Deliveries.**

(a)    <u>Seller Closing Deliveries</u>.   At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser, for cancellation, stock certificates representing in the aggregate all of the issued and outstanding shares of Way to Grow Common Stock.

(b)    <u>Purchaser Closing Deliveries</u>.   At the Closing (except as expressly set forth below), Purchaser shall deliver, or cause to be delivered, the following:

(i)    to Seller, on January 4, 2016, the Cash Payment by wire transfer of immediately available funds to the account designated by Seller;

(ii)    to Seller, the executed Seller Note and any exhibits and schedules related thereto; and

(iii)    to Seller, stock certificates representing the Payment Shares, subject to the Clawback and the Lockup Agreement.

**2.3.    Effective Times.**   Subject to the terms and conditions set forth in this Agreement, on the Closing Date, a Certificate of Merger substantially in the form of <u>Exhibit C</u> (the "<u>First Merger Certificate of Merger</u>") shall be duly executed by PSub1 and Way to Grow and thereafter filed with the Secretary of State of the State of Nevada. The First Merger shall become effective at the effective time stated in the First Merger Certificate of Merger with the Secretary of State of the State of Nevada on or prior to the Closing Date (the time the First Merger becomes effective being referred to herein as the "<u>First Merger Effective Time</u>").   Subject to the terms and conditions set forth in this Agreement, on the Closing Date, a Certificate of Merger substantially in the form of <u>Exhibit D</u> (the "<u>Second Merger Certificate of Merger</u>") shall be duly executed by the First Merger Surviving Entity and PSub2 and thereafter filed with the Secretary of State of the State of Nevada.   The Second Merger shall become effective at the effective time stated in the Second Merger Certificate of Merger with the Secretary of State of the State of Nevada on or prior to the Closing Date (the time the Second Merger becomes effective being referred to herein as the "<u>Second Merger Effective Time</u>" or the "<u>Effective Time</u>").

**2.4.    Certificate of Incorporation and Bylaws; Directors and Officers; Effect of First Merger.**  Unless otherwise determined by Purchaser and Way to Grow prior to the First Merger Effective Time:

(a)    The First Merger Surviving Entity's certificate of incorporation shall be amended and restated as of the First Merger Effective Time in accordance with the relevant provisions of the

CCAA to confirm to the certificate of incorporation of PSub1 except that the name of the corporation shall remain "WAY TO GROW, INC.";

(b)      the Bylaws of the First Merger Surviving Entity shall be amended and restated as of the First Merger Effective Time to conform to the Bylaws of PSub1 as in effect immediately prior to the First Merger Effective Time; and

(c)      the directors and officers of the First Merger Surviving Entity immediately after the First Merger Effective Time shall be the individuals identified by Purchaser in its reasonable discretion prior to the First Merger Effective Time.

**2.5.     Certificate of Incorporation and Bylaws; Directors and Officers; Effect of Second Merger**.   Unless otherwise determined by Purchaser and Way to Grow prior to the Second Merger Effective Time:

(a)      the Surviving Entity's certificate of incorporation shall be the certificate of incorporation of PSub2 as in effect immediately prior to the Second Merger Effective Time, as set forth in Exhibit E hereto (the "Amended and Restated Certificate of Incorporation") and, as so amended, such Amended and Restated Certificate of Incorporation shall be the certificate of incorporation of the Surviving Entity until thereafter changed or amended in accordance with the terms and conditions stated therein or under Applicable Law;

(b)      the Bylaws of the Surviving Entity as of the Second Merger Effective Time shall be the Bylaws of PSub2 as in effect immediately prior to the Second Merger Effective Time; and

(c)      the directors and officers of the Surviving Entity immediately after the Second Merger Effective Time shall be the individuals identified by Purchaser in its reasonable discretion prior to the Second Merger Effective Time.

**2.6.     Effects of First Merger.**   By virtue of the First Merger and without any further action on the part of Purchaser, PSub1, Way to Grow or Seller, each share of Way to Grow issued and outstanding immediately prior to the First Merger Effective Time will be cancelled and extinguished and will be converted automatically into the right to receive the Aggregate Consideration.   By virtue of the First Merger and without any further action on the part of Purchaser, PSub1, Way to Grow or Seller, each share of the common stock, no par value, of PSub1 (the "PSub1 Common Stock") outstanding immediately prior to the First Merger Effective Time shall be converted into, and exchanged for, one newly and validly issued, fully paid and nonassessable share of common stock of the First Merger Surviving Entity.   Each certificate evidencing ownership of shares of PSub1 shall evidence ownership of such shares of capital stock of the First Merger Surviving Entity.

**2.7.     Effects of Second Merger.**   By virtue of the Second Merger and without any further action on the part of Purchaser, Psub2, First Merger Surviving Entity or the respective stockholders thereof, each share of capital stock of the First Merger Surviving Entity that is issued and outstanding immediately prior to the effective time of the Second Merger shall be cancelled without any consideration paid therefor and effective as of the effective time of the Second Merger.   By virtue of the Second Merger and without any action on the part of Purchaser, PSub2, the First Merger Surviving Entity or the respective stockholders thereof, each share of capital stock of PSub2 that is issued and outstanding immediately prior to the effective time of the Second Merger shall remain issued and outstanding.

**2.8.     Closing of Way to Grow's Transfer Books**. At the Effective Time, holders of certificates representing the Way to Grow Common Stock that were outstanding immediately

13

prior to the Effective Time shall cease to have any rights as equity holders of Way to Grow, and the stock transfer books of Way to Grow shall be closed with respect to all shares of Way to Grow Common Stock outstanding immediately prior to the Effective Time. No further transfer of any such shares of Way to Grow Common Stock shall be made on such stock transfer books after the Effective Time.

**2.9.     Further Action**.  If, at any time after the Effective Time, any further action is determined by Purchaser to be necessary or desirable to carry out the purposes of this Agreement or to vest the Surviving Entity and its subsidiaries or Purchaser with full right, title and possession of and to all rights and property of PSub1 and Way to Grow, the officers and directors of the Surviving Entity and its subsidiaries and Purchaser shall be fully authorized (in the name of PSub1, in the name of Way to Grow and otherwise) to take such action.

**3.**

<b>Representations and Warranties of Seller and Way to Grow</b>

Subject to Section 10.05, except as set forth in the Disclosure Schedule, Seller represents and warrants to Purchaser:

**3.1.     Corporate Existence and Power**.

(a)     Way to Grow is a corporation duly incorporated, validly existing and in good standing under the laws of Colorado and has all requisite corporate power and authority to carry on its business as now conducted. Way to Grow is duly qualified to do business as a foreign corporation or other entity and is in good standing in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Section 3.01(b) of the Disclosure Schedule sets forth a true, correct and complete list of Way to Grow's Subsidiaries as of the date of this Agreement.  Each of the Subsidiaries of Way to Grow (i) has been duly organized, and is validly existing and in good standing under the Applicable Laws of the jurisdiction of its organization; (ii) is duly licensed or qualified to do business and is in good standing as a foreign entity in all jurisdictions in which the conduct of its business or the activities it is engaged makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing has not had and would not reasonably be expected to have a Material Adverse Effect; and (iii) has all requisite corporate power and authority to carry on its business as now conducted.  Way to Grow is not a participant in any joint venture, partnership or similar arrangement.  Way to Grow has not agreed and is not obligated to, directly or indirectly, make any future investment in or capital contribution to any Person.

(c)     Seller has made available to Purchaser accurate and complete copies of: (i) the Organizational Documents of Way to Grow; and (ii) the stock records of Way to Grow.  The minutes and other records of the meetings and other proceedings (including any actions taken by written consent or otherwise without a meeting) of Way to Grow, the Way to Grow Board of Directors and all committees thereof, made available to Purchaser by Seller since inception, are accurate and complete in all material respects.  There has not been any violation of any of the provisions of the Organizational Documents of Way to Grow, and Way to Grow has not taken any action that is inconsistent in any material respect with any resolution adopted since inception by the stockholders of Way to Grow, the Way to Grow Board of Directors or any committee thereof.

14

**3.2.    Corporate Authorization.** Each of Seller and Way to Grow has all requisite power and authority to enter into and to perform its obligations under this Agreement; and the execution, delivery and performance by Seller and Way to Grow of this Agreement have been duly authorized by all necessary action on the part of Seller and Way to Grow. Assuming the due authorization, execution and delivery of this Agreement by Purchaser, this Agreement constitutes the legal, valid and binding obligation of Seller and Way to Grow, enforceable against Seller and Way to Grow in accordance with its terms, subject to (i) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

**3.3.    Governmental Authorization.** The execution, delivery and performance by Seller and Way to Grow of this Agreement and the consummation by Seller and Way to Grow of the Transaction require no action by or in respect of, or filing with, any Governmental Authority other than (i) compliance with any applicable requirements of applicable U.S. state or federal securities laws, and (ii) any actions or filings the absence of which would be, individually or in the aggregate, material to Seller or Way to Grow or impair the ability of Seller or Way to Grow to consummate the Transaction.

**3.4.    Non-contravention.** The execution, delivery and performance by Seller and Way to Grow of this Agreement and the consummation of the Transaction do not and will not (i) contravene, conflict with, or result in any violation or breach of any provision of the Organizational Documents of Seller or Way to Grow, (ii) assuming compliance with the matters referred to in Section 3.03, and subject to obtaining the required Way to Grow stockholder approval, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, (iii) assuming compliance with the matters referred to in Section 3.03, and subject to obtaining the required Way to Grow Stockholder approval, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which Way to Grow is entitled under any provision of any Material Contract binding upon Way to Grow or any material Permit affecting, or relating in any way to, the assets or business of Way to Grow or (iv) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Way to Grow.

**3.5.    Capitalization.**

(a)    The issued and outstanding capital stock of Way to Grow consists solely of 100 shares of Way to Grow Common Stock, all of which are owned by Seller, free and clear of any Liens. All outstanding shares of Way to Grow Common Stock have been duly authorized and validly issued and are fully paid and nonassessable. There are no shares of Way to Grow Common Stock that remain subject to vesting or forfeiture restrictions. Except as otherwise set forth above, there are no outstanding (i) shares of capital stock or voting securities of Way to Grow, (ii) securities of Way to Grow convertible into or exchangeable for shares of Way to Grow or voting securities of Way to Grow or (iii) options or other rights to acquire from Way to Grow, or other obligation of Way to Grow to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of Way to Grow.

(b)    All outstanding shares of Way to Grow Common Stock have been issued and granted in material compliance with (i) all applicable securities laws and other Applicable Laws and (ii) all requirements set forth in applicable Contracts.

(c)      Way to Grow has never repurchased, redeemed or otherwise reacquired any shares of its capital stock and there are no outstanding rights or obligations of Way to Grow to repurchase or redeem any of its securities.

(d)      Section 3.05(d) of the Disclosure Schedule lists for each Subsidiary of Way to Grow the percentage of equity securities owned or controlled, directly or indirectly, by Way to Grow as of the date hereof.  Way to Grow does not have or is not bound by any outstanding subscriptions, options, warrants, calls, commitments, rights agreements or agreements of any character calling for it to issue, deliver or sell, or cause to be issued, delivered or sold, any of its equity securities or any securities convertible into, exchangeable for or representing the right to subscribe for, purchase or otherwise receive any such equity security or obligating such Subsidiary to grant, extend or enter into any such subscriptions, options, warrants, calls, commitments, rights agreements or other similar agreements.  There are no outstanding contractual obligations of any Subsidiary of Way to Grow to repurchase, redeem or otherwise acquire any of its capital stock or other equity interests.  All of the shares of capital of each of the Subsidiaries of Way to Grow are validly issued, fully paid (to the extent required under the applicable governing documents) and nonassessable and are owned by Way to Grow or a Subsidiary of Way to Grow free and clear of any Liens.

**3.6.     Financial Statements.**

(a)      Seller has made available to Purchaser Way to Grow's unaudited consolidated balance sheets as of December 31, 2014 and 2013, and the related unaudited consolidated profit and loss accounts for each of the years ended December 31, 2014 and 2013 and unaudited consolidated profit and loss accounts for the year ended December 31, 2012, and the unaudited consolidated balance sheets as of August 31, 2015  (the "Unaudited Year End Balance Sheet"), and the related unaudited consolidated profit and loss accounts for the year ended December 31, 2014 (collectively, the "Financial Statements").

(b)      The Financial Statements (i) have been prepared from the books and records of Way to Grow, (ii) complied as to form in all material respects with applicable accounting requirements with respect thereto as of their respective dates, (iii) to the Knowledge of Seller have been prepared in accordance with US GAAP applied on a consistent basis throughout the periods indicated and consistent with each other, and (iv) give a true and fair view, to the Knowledge of Seller in accordance with US GAAP, of the financial position of Way to Grow at the dates therein indicated and the results of operations of Way to Grow for the periods therein specified (subject, in the case of unaudited financial statements for the year ended December 31, 2014, to the absence of notes and normal year-end audit adjustments, none of which individually or in the aggregate will be material in amount).

(c)      The books of account and other financial records of Way to Grow have been kept accurately in the ordinary course of business consistent with Applicable Laws in all material respects consistent with the past practices of Way to Grow and accounts, notes and other receivables and inventory are recorded accurately in all material respects, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

**3.7.     Absence of Certain Change.**   Between the Balance Sheet Date and the date of this Agreement, the business of Way to Grow has been conducted in the ordinary course consistent with past practices and there has not been:

16

(a)      any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)      any material damage, destruction, abandonment, or other casualty loss (whether or not covered by insurance) affecting the business or assets of Way to Grow;

(c)      any material amendment of the Organizational Documents (whether by merger, consolidation or otherwise) of Way to Grow;

(d)      any splitting, combination or reclassification of any shares of capital stock of Way to Grow or declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities of Way to Grow, or redemption, repurchase or other acquisition or offer to redeem, repurchase, or otherwise acquire any securities of Way to Grow, other than quarterly dividend payments (including, for the avoidance of doubt, any estimated amounts necessary to satisfy the 2015 tax liabilities of Seller) to Seller consistent with past practice and Way to Grow policy;

(e)      any issuance, delivery or sale, or authorization of the issuance, delivery or sale of, any shares of any capital stock of Way to Grow;

(f)      any incurrence of any capital expenditures or any obligations or liabilities in respect thereof by Way to Grow and in excess of U.S. $100,000 in the aggregate other than incurred in the ordinary course of business consistent with past practice;

(g)      any acquisition (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, by Way to Grow of any assets, securities, properties, interests or businesses of any third party;

(h)      any sale, lease, license, or other transfer, or creation or incurrence of any Lien on, any assets, securities, properties, interests or businesses of Way to Grow, other than sales or licenses of Way to Grow Products in the ordinary course of business;

(i)      the making by Way to Grow of any loans, advances or capital contributions to, or investments in, any other Person;

(j)      the creation, incurrence or assumption by Way to Grow of any Indebtedness, that has been incurred from time to time under Way to Grow's existing loan agreements other than in the ordinary course of business;

(k)      (i) the entering into of any Contract that limits or otherwise restricts in any material respect the ability to compete or the geographic scope of the business of Way to Grow or any of its Affiliates or any successor thereto or that would reasonably be expected to, after the Closing, limit or restrict in any material respect Way to Grow, Purchaser or any of their respective Affiliates, from engaging or competing in any line of business (including any grant of exclusivity with respect to Intellectual Property Rights or otherwise), in any location or with any Person or (ii) the entering into, amendment or modification in any material respect or termination of any Material Contract or waiver, release or assignment of any material rights, claims or benefits of Way to Grow;

(l)      the sale, disposition, transfer or license to any Person of any rights to any Technology or any Intellectual Property Rights (other than on a non-exclusive basis in the ordinary course of business consistent with past practice);;

17

(m)     the entering into any arrangement, the result of which is the loss, expiration or termination of any material license or right under or to any Third Party IP;

(n)     (i) the grant or increase of, or commitment to grant or increase, any form of compensation or benefits payable to any director, officer, advisor, consultant or employee of Way to Grow, including pursuant to any employee benefit plan, in excess of $25,000 in the aggregate, (ii) the hiring or termination of any material employee, officer, director or consultant of Way to Grow, (iii) the adoption, entering into, material modification or termination of any employee benefit plan, (iv) the acceleration of the vesting or payment of any compensation or benefits under any employee benefit plan, or (v) the grant of any equity or equity-linked awards or other bonus, commission or other incentive compensation to any director, officer, advisor, consultant or employee of Way to Grow, other than, with respect to clauses (i) and (ii) above, in the ordinary course of business consistent with past practice to any advisor, consultant or employee of Way to Grow who receives less than $60,000 in base compensation per annum, other than quarterly and/or annual payments to its current employees consistent with past practice and Way to Grow policy and existing profit sharing and bonus plans;

(o)     any change in the methods of accounting or accounting practices of Way to Grow, except as required by concurrent changes in US GAAP, as agreed to by its independent public accountants;

(p)     any settlement, or offer or proposal to settle, (i) any material Proceeding or claim involving or against Way to Grow, (ii) any stockholder litigation or dispute against Way to Grow or any of its officers or directors or (iii) any Proceeding that relates to the transactions contemplated hereby;

(q)     any material Tax election changed or revoked; any claim, notice, audit report or assessment in respect of Taxes settled or compromised (or agreement with respect thereto); any Tax allocation agreement, Tax sharing agreement, advance pricing agreement, cost sharing agreement, pre-filing agreement, Tax indemnity agreement or closing agreement relating to any Tax entered into; any Tax petition, Tax complaint or administrative Tax appeal filed; any Tax audit or inquiry filed; or any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment consented to; or

(r)     any agreement or commitment to take any of the actions referred to in clauses (a) through (q).

**3.8.     No Undisclosed Liabilities**.  Way to Grow has no liabilities or obligations of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than:

(a)     liabilities or obligations disclosed and provided for in the Financial Statements or in the notes thereto;

(b)     liabilities that have been incurred by Way to Grow since the Balance Sheet Date in the ordinary course of business and consistent with past practice;

(c)     the liabilities or obligations identified in Section 3.08 of the Disclosure Schedule; and

(d)     liabilities or obligations arising under this Agreement or that would not reasonably be expected to be material to Way to Grow.

**3.9.     Material Contracts**.

(a)      Way to Grow is a party to or bound by any of the following (a Contract responsive to any of the following categories being hereinafter referred to as a "Material Contract"):

(i)      any lease (whether of real or personal property) providing for annual rentals of U.S. $30,000 or more;

(ii)      any Contract pursuant to which any Intellectual Property Right or Technology, including any Third Party IP (in each case, excluding Foreground IP), is licensed, sold, assigned or otherwise conveyed or provided to Way to Grow or pursuant to which any Person has agreed not to enforce any Intellectual Property Right against Way to Grow, other than Contracts for Generally Available Software and contracts with Company employees under a standard invention assignment agreement;

(iii)      any Contract pursuant to which any Intellectual Property Right or Technology (in each case, excluding Foreground IP) is or has been licensed (whether or not such license is currently exercisable), sold, assigned or otherwise conveyed or provided to a third party by Way to Grow, or pursuant to which Way to Grow has agreed not to enforce any Intellectual Property Right against any third party.

(iv)      any Contract  imposing any restriction on Way to Grow's right or ability, or, after the Closing, the right or ability of Purchaser or any of its Affiliates (A) to compete in any line of business or with any Person or in any area or which would so limit the freedom of Purchaser or any of its Affiliates after the Closing Date (including granting exclusive rights or rights of first refusal to license, market, sell or deliver any of the products or services offered by Way to Grow or any related Intellectual Property Right), (B) to acquire any product or other asset or any services from any other Person, to sell any product or other asset to or perform any services (other than products or services which are customized for a particular customer and which contain Foreground IP) for any other Person or to transact business or deal in any other manner with any other Person, or (C) to develop or distribute any Intellectual Property Right or Technology (in each case, excluding Foreground IP);

(v)      any Contract for the purchase of materials, supplies, goods, services, equipment or other assets providing for either (A) annual payments by Way to Grow of U.S. $200,000 or more or (B) aggregate payments by Way to Grow of U.S. $400,000 in the past two years;

(vi)      any Contract providing for "most favored customer" terms or similar terms, including such terms for pricing;

(vii)      any sales, distribution or other similar agreement providing for the sale of Way to Grow Products that provides for (A) annual payments to Way to Grow of U.S. $1,000,000 or more or (B) aggregate payments to Way to Grow of U.S. $2,000,000 in the past two years;

(viii)      any partnership, joint venture or any sharing of revenues, profits, losses, costs or liabilities or any other similar Contract;

(ix)      any Contract relating to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) or pursuant to which Way to Grow has any current or future rights or obligations;

(x)      any Contract relating to Indebtedness or the deferred purchase price of property (in either case, whether incurred, assumed, guaranteed or secured by any asset);

(xi)      any Contract relating to the acquisition, issuance or transfer of any securities;

19

(xii)    any Contract relating to any interest rate, currency or commodity derivatives or hedging transaction;

(xiii)    any Contract under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of Way to Grow or (B) Way to Grow has directly or indirectly guaranteed liabilities or obligations of any other Person (in each case other than endorsements for the purposes of collection in the ordinary course of business);

(xiv)    any Contract relating to the creation of any Lien (other than Permitted Liens) with respect to any asset of Way to Grow;

(xv)    any Contract which contains any provisions requiring Way to Grow to indemnify any other party (excluding indemnities contained in agreements for the purchase, sale or license of products or services in the ordinary course of business consistent with past practice);

(xvi)    any Contract with any Related Person;

(xvii)    any employment, severance, retention, change-in-control, bonus or other Contract with any current or former employee, officer, director, advisor or consultant of Way to Grow (A) pursuant to which Way to Grow has any current or future rights or obligations, (B) that provides for the payment of any cash or other compensation or benefits upon the consummation of the Transaction, or (C) that otherwise restricts Way to Grow's ability to terminate the employment or engagement of such individual without penalty or liability (excluding any penalty or liability in respect of the employee's notice period and right not to be unfairly dismissed), other than, in each case, Contracts entered into in the ordinary course of business consistent with past practice with any advisor, consultant or employee of Way to Grow who receives less than U.S. $60,000  in base compensation per annum;

(xviii)   any Contract that cannot be provided to the Purchaser; and

(xix)    any other Contract not made in the ordinary course of business that is material to Way to Grow.

(b)    Seller has made available to Purchaser accurate and complete copies of all written Contracts identified in Section 3.09(a) of the Disclosure Schedule, including all amendments thereto.   Section 3.09(a) of the Disclosure Schedule provides an accurate description of the material terms of each Material Contract identified in Section 3.09(a) of the Disclosure Schedule that is not in written form.   Way to Grow has notified Purchaser of any Contracts or portions thereof that Way to Grow has withheld from Purchaser pursuant to Section 5.03(b) and has disclosed to Purchaser any material liabilities or obligations under any such Contracts, to the extent permitted thereunder.

(c)    Each Material Contract is a valid and binding agreement of Way to Grow, and is in full force and effect, and Way to Grow is and, to the Knowledge of Seller and Way to Grow, no other party thereto is in default or breach in any material respect under the terms of any such Contract, and, to the Knowledge of Seller and Way to Grow, other than as set forth in Section 3.04 of the Disclosure Schedule regarding the consummation of the Transaction, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or would reasonably be expected to, (i) result in a violation or breach of any of the provisions of any Material Contract, (ii) give any Person the right to declare a default or exercise any remedy under any Material Contract, (iii) give any Person the right to accelerate the maturity or performance of any grant or rights or other obligation under a Material Contract, or (iv) give any Person the right to cancel, terminate or modify any Material Contract.

20

(d)      Since inception, Way to Grow has not received any written notice or, to the Knowledge of Seller or Way to Grow, any other communication regarding any violation or breach of, or default under, any Material Contract.

(e)      No Person is renegotiating, or has a right (or has asserted a right) pursuant to the terms of any Material Contract to renegotiate, any amount paid or payable to Way to Grow under any Material Contract or any other material term or provision of any Material Contract.

**3.10.    Compliance with Applicable Laws.**

(a)      Way to Grow is, and has at all times since inception been, in material compliance with, and to the Knowledge of Seller and Way to Grow is not, and at no time since inception has been, under investigation with respect to or threatened to be charged with or given notice of any violation of, any Applicable Law.

(b)      Way to Grow, and, to the Knowledge of the Seller and Way to Grow, each of its Affiliates and Representatives, is, and has at all times since inception, been, in material compliance with all export control and sanctions laws and regulations that are applicable to Way to Grow, and, to the Knowledge of the Seller and Way to Grow, its Affiliates and Representatives, as the case may be, in particular the U.S. Export Administration Act and implementing Export Administration Regulations; the U.S. Arms Export Control Act and implementing International Traffic in Arms Regulations; the various economic sanctions laws administered by the Office of Foreign Assets Control ("OFAC") of the U.S. Treasury Department; ("Export and Sanctions Laws").   Without limiting the foregoing:

(i)      Way to Grow is, and has at all times since inception, been, in possession of all export licenses, authorizations and other approvals that are required by applicable Export and Sanctions Laws for the export of its products, services, software or technologies, as applicable;

(ii)      there are no pending or, to the Knowledge of Seller or Way to Grow, threatened claims or investigations of potential violations of applicable Export and Sanctions Laws by Way to Grow with respect to export or other business activity or licenses, authorizations or other approvals;

(iii)      to the Knowledge of Seller or Way to Grow, there are no actions, conditions or circumstances pertaining to Way to Grow's export transactions or other business activities that may give rise to any future claims or investigations of potential violations of applicable Export and Sanctions Laws; and

(iv)      to the Knowledge of Seller and Way to Grow, none of Way to Grow's Affiliates or Representatives, is currently the subject of any sanctions administered or enforced by the U.S. Government (including, without limitation, OFAC or the U.S. Department of State), the United Nations Security Council, or other relevant sanctions authority.

(c)      Since inception, Way to Grow has not and, to the Knowledge of Seller and Way to Grow, no employee or other Person associated with or acting on behalf of Way to Grow (including any agent) has, directly or indirectly, in connection with Way to Grow:

(i)      made any unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity and related in any way to Way to Grow's business;

21

(ii)     made any unlawful payment to any foreign or domestic government official or employee, foreign or domestic political parties or campaigns, official of any public international organization, or official of any state-owned enterprise;

(iii)    violated or committed any offense under any provision of the U.S. Foreign Corrupt Practices Act or any other applicable anti-corruption law (the "Anti-Corruption Law"); or

(iv)    made any bribe, payoff, influence payment, kickback or other similar unlawful payment.

(d)     There are no pending and, to the Knowledge of Seller and Way to Grow, since inception there have not been any threatened claims or investigations or potential violations, or other actions, conditions or circumstances giving rise to any future claims or investigations of potential violations, of applicable Anti-Corruption Laws by Way to Grow related in any way to Way to Grow's business.

(e)     To the Knowledge of Seller and Way to Grow, each of the Way to Grow Products that Way to Grow owns, develops, manufactures or licenses is and has since inception been at all times up to and including the sale, license, distribution or other provision thereof, marketed, licensed, sold, performed or otherwise made available in compliance in all material respects with all Applicable Laws.

(f)     To Way to Grow's Knowledge, and except to the extent non-compliance has not resulted in and would likely not result in a Way to Grow Material Adverse Effect, Way to Grow is, and has at all times been, in material compliance with (i) all Applicable Laws regarding the protection, storage, use and disclosure of Personal Data, and (ii) the privacy policies and other Contracts (or portions thereof) in effect between Way to Grow and its customers and business partners, in each case that are applicable to the use and disclosure of Personal Data.   To Way to Grow's Knowledge, and except to the extent non-compliance has not resulted in and would likely not result in a Way to Grow Material Adverse Effect, Way to Grow has reasonable safeguards in place to protect Personal Data in Way to Grow's possession or control from unauthorized access by third Persons, including Way to Grow's employees and contractors.

## 3.11.   Litigation.

(a)     There is no pending material Proceeding, and to the Knowledge of Seller and Way to Grow, since inception, no Person has threatened to commence any Proceeding:  (i) that involves Way to Grow or any of the assets owned or used by Way to Grow or any Person whose liability Way to Grow has or may have retained or assumed, either contractually or by operation of law; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with the Transaction.  To the Knowledge of Seller or Way to Grow, no event has occurred, and no claim, dispute or other condition or circumstance exists, that will, or that would reasonably be expected to, give rise to or serve as a basis for the commencement of any Proceeding that is of a type described in the preceding sentence.

(b)     There is no material order, writ, injunction, directive, restriction, judgment or decree to which Way to Grow, or any of the assets owned or used by Way to Grow, is subject or which restricts in any respect the ability of Way to Grow to conduct its business. To the Knowledge of Seller and Way to Grow, no officer or other employee of Way to Grow is subject to any order, writ, injunction, judgment or decree that prohibits such officer or other employee from engaging in or continuing any conduct, activity or practice relating to the business of Way to Grow.

22

**3.12.   Real Property**. Way to Grow has good and valid title to each parcel of real property owned in fee by Way to Grow (the "Owned Real Property"), and an equitable interest in each parcel of real property leased by Way to Grow (the "Leased Real Property" and together with the Owned Real Property, the "Way to Grow Real Property"). Section 3.12(a)(i) of the Disclosure Schedule lists each parcel of Owned Real Property and Section 3.12(a)(ii) of the Disclosure Schedule lists each lease, sublease, license or other occupancy agreement or arrangement relating to the Leased Real Property (each, a "Real Property Lease").

(a)     The Way to Grow Real Property is not subject to any Liens, except for Permitted Liens. Way to Grow has not received any written notice within the 12 months prior to the date of this Agreement of a material violation of any ordinances, regulations or building, zoning or other similar laws with respect to the Way to Grow Real Property. Way to Grow has not received any written notice of any expiration of, pending expiration of, changes to, or pending changes to any material entitlement relating to Way to Grow Real Property and there is no condemnation, special assessment or the like pending or, to the Knowledge of Seller, threatened with respect to any Way to Grow Real Property.  Way to Grow has the right to use and occupy the Way to Grow Leased Real Property for the full term of the Real Property Lease relating thereto.

(b)      Way to Grow has made available to Purchaser true and complete copies of the Real Property Leases, together with all amendments, modifications and supplements thereto.  With respect to the Leased Real Property, Way to Grow has not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in any Leased Real Property, other than Permitted Liens.

(c)     Except for the Way to Grow Real Property, there is no continuing liability in respect of any other property formerly owned or occupied by Way to Grow either as the original contracting party or by virtue of any direct covenant having been given on a sale or assignment to Way to Grow or as a guarantor of the obligations of any other Person in relation to such property.

**3.13.   Properties**.

(a)     Way to Grow has good and marketable, indefeasible, fee simple title to, or in the case of leased property and assets, have valid leasehold interests in, all personal property and assets (whether tangible or intangible) reflected on the Unaudited Year End Balance Sheet or acquired after the Balance Sheet Date, except for properties and assets sold since the Balance Sheet Date in the ordinary course of business consistent with past practices.  None of such property or assets is subject to any Lien, except:

(i)     Liens disclosed on the Unaudited Year End Balance Sheet;

(ii)     Liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Unaudited Year End Balance Sheet);

(iii)     mechanics', landlords', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business; or

(iv)     Liens which do not materially detract from the value or materially interfere with any present use of such property or assets (clauses "(i)" through "(iv)" of this Section 3.13(a) are, collectively, the "Permitted Liens").

(b)     There are no developments affecting any such property or assets pending or, to the Knowledge of Seller and Way to Grow threatened which would reasonably be expected to materially detract from the value, materially interfere with any present or intended use or

23

materially adversely affect the marketability of any such property or assets. All leases of such personal property are in good standing and are valid, binding and enforceable in accordance with their respective terms and there does not exist under any such lease any default or any event which with notice or lapse of time or both would constitute a default.

(c)      The equipment owned by Way to Grow has no material defects, is in good operating condition and repair and has been reasonably maintained consistent with standards generally followed in the industry (giving due account to the age and length of use of same, ordinary wear and tear excepted).

(d)      The property and assets owned or leased by Way to Grow, or which they otherwise have the right to use, constitute all of the property and assets used or held for use by Way to Grow in connection with the Business and are adequate to conduct the Business as currently conducted.

**3.14.   Intellectual Property.**

(a)      Section 3.14(a) of the Disclosure Schedule sets forth a complete and accurate list as of the date of this Agreement of (i) each item of Registered IP in which the Company has or purports to have an ownership interest of any nature (whether exclusively, jointly with another Person, or otherwise), (ii) the jurisdiction in which such item of Registered IP has been registered or filed and the applicable application, registration, or serial or other similar identification number, and (iii) any other Person that has an ownership interest in such item of Registered IP and the nature of such ownership interest. Seller and the Company have made available to Purchaser complete and accurate copies of all applications related to each such item of Registered IP. Neither Way to Grow nor Seller owns any Patents or any patent applications.

(b)      Section 3.14(b) of the Disclosure Schedule accurately identifies as of the date of this Agreement (i) all Intellectual Property Rights or Technology licensed, sold, assigned or otherwise conveyed or provided to Way to Grow (other than (a) Generally Available Software and (b) Intellectual Property Rights assigned to Way to Grow by its employees or independent contractors under standard commercial agreements), (ii) the corresponding Contract or Contracts pursuant to which such Intellectual Property Right or Technology is licensed to the Company, and (iii) whether the license or licenses granted to the Company is or are, as the case may be, exclusive or nonexclusive.

(c)      To the Knowledge of the Company and Seller, all Way to Grow IP is valid, subsisting, and enforceable. All filings, payments and other actions required to be made or taken to obtain, perfect or maintain in full force and effect each item of Way to Grow IP that is Registered IP have been made or taken by the applicable deadline and otherwise in accordance with all Applicable Laws. To the Knowledge of Seller, no application for, or registration with respect to, any Registered IP that is Way to Grow IP has been abandoned, allowed to lapse, or rejected, since January 1, 2012. Section 3.14(c) of the Disclosure Schedule sets forth a complete and accurate list of each filing, payment, and action that must be made or taken on or before the date that is 90 days after the Closing Date in order to obtain, perfect or maintain in full force and effect each item of Way to Grow IP that is Registered IP. No interference, opposition, reissue, reexamination, or other Proceeding of any nature is, or since January 1, 2012 has been, pending or threatened in which the scope, validity, or enforceability of any Way to Grow IP is being, has been, or could reasonably be expected to be contested or challenged, and to the Knowledge of Seller there is no basis for a claim that any Way to Grow IP is invalid or unenforceable.

(d)      The Company is not bound by, and no Way to Grow IP is subject to, any Contract containing any covenant or other provision that in any way limits or restricts the ability of the Company to use, assert, enforce, or otherwise exploit any Way to Grow IP anywhere in the world.

24

Except with respect to Foreground IP, the Company has not transferred ownership of (whether a whole or partial interest), or granted any exclusive right to use, any Way to Grow IP to any Person.

(e)     The Company exclusively owns all right, title, and interest to and in the Way to Grow IP free and clear of any Liens (other than Foreground IP and non-exclusive licenses granted in the ordinary course of business consistent with past practice). The Way to Grow IP, together with the Technology and Intellectual Property Rights licensed to the Company, consist of all the Technology and Intellectual Property Rights used in, held for use in, or otherwise necessary for the conduct of the Business as currently conducted. The Company has sufficient rights in the Foreground IP necessary to conduct the Business as currently conducted.

(f)     To the Knowledge of the Company and Seller, no current or former stockholder, officer, director, or employee of the Company has any claim, right (whether or not currently exercisable), or interest to or in any Way to Grow IP. To the Knowledge of the Company, no employee of the Company is (i) bound by or otherwise subject to any Contract restricting him or her from performing his or her duties for the Company or (ii) in breach of any Contract with any former employer or other Person concerning Technology, Intellectual Property Rights or confidentiality.

(g)     To the Knowledge of the Company and Seller, no Person has infringed, misappropriated, or otherwise violated, or is currently infringing, misappropriating, or otherwise violating, any Way to Grow IP. Section 3.14(g) of the Disclosure Schedule sets forth an accurate and complete list as of the date of this Agreement (and the Company has made available to Purchaser a complete and accurate copy of) each letter or other written or electronic communication or correspondence that has been sent or otherwise delivered by or to the Company or any representative of the Company regarding any actual, alleged, or suspected infringement or misappropriation of any Way to Grow IP since January 1, 2012, and provides a brief description of the current status of the matter referred to in such letter, communication, or correspondence.

(h)     Since January 1, 2012, the Company has not received written notice that it has infringed, misappropriated, or otherwise violated, or is currently infringing, misappropriating, or otherwise violating, any Intellectual Property Right of any other Person. Without limiting the foregoing, and to the Knowledge of Company, the Way to Grow IP (i) does not infringe, misappropriate or violate the Intellectual Property Rights of any other Person and (ii) have not infringed, misappropriated or violated the Intellectual Property Rights of any other Person. No infringement, misappropriation, or similar claim or Proceeding is pending or, to the Knowledge of Seller, threatened against the Company or against any Person who may be entitled to be indemnified or reimbursed by the Company with respect to such claim or Proceeding. Since January 1, 2012, the Company has received any notice (in writing) relating to any actual, alleged, or suspected infringement, misappropriation, or violation of any Intellectual Property Right of another Person, including any written notice inviting the Company to take a license under any Intellectual Property Right.

**3.15.   Information Technology**. The information technology systems used by Way to Grow ("IT Systems") are designed, implemented, operated and maintained in accordance with customary industry standards and practices. Without limiting the foregoing, (a) Way to Grow has taken reasonable steps and implemented reasonable procedures to ensure that its IT Systems are free from Malicious Code, and (b) Way to Grow has in effect industry standard disaster recovery plans, procedures and facilities for its business and has taken reasonable steps to safeguard the security and the integrity of its IT Systems. To the Knowledge of Seller and Way to Grow, there have been no unauthorized intrusions or breaches of security with respect to the IT Systems. Way to Grow has implemented substantially all security patches or upgrades that are generally available for the IT Systems.

25

**3.16.    Insurance Coverage**.  Seller has made available to Purchaser accurate and complete copies of all insurance policies and fidelity bonds relating to the assets, business, operations, employees, officers or directors of Way to Grow, each of which is in full force and effect.  There is no claim by Way to Grow pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds or in respect of which such underwriters have reserved their rights.  All premiums payable under all such policies and bonds have been timely paid and Way to Grow has otherwise complied in all material respects with the terms and conditions of all such policies and bonds.  Seller and Way to Grow have no Knowledge of any threatened termination of, premium increase with respect to, or material alteration of coverage under, any of such policies or bonds.  After the Closing, Way to Grow shall continue to have coverage under such policies and bonds with respect to events occurring prior to the Closing.

**3.17.    Licenses and Permits**.  Way to Grow has, and at all times since its inception has had, all material licenses, permits, qualifications, accreditations, approvals and authorizations of any Governmental Authority (collectively, the "Permits"), and has made all filings required under Applicable Law, necessary to conduct its business in accordance with Applicable Law.  Since its inception, Way to Grow has not received any written notice or other written communication regarding any actual or possible violation of or failure to comply with any term or requirement of any Permit or any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Permit.  Section 3.17(a) of the Disclosure Schedule sets forth an accurate and complete list of all Permits issued to Way to Grow.  Each such Permit has been validly issued or obtained and is, and after the consummation of the Transaction will be, in full force and effect. Section 3.17(b) of the Disclosure Schedule sets forth an accurate and complete list of all Permits for which Way to Grow has applied or has taken the steps necessary to secure or maintain or that Way to Grow otherwise intends to obtain.

**3.18.    Tax Matters**.

(a)    Way to Grow has duly and timely filed with the appropriate Tax authorities all Tax Returns required to be filed for all taxable years.  All such Tax Returns are correct and complete in all respects and were prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by Way to Grow (whether or not shown on any Tax Returns and including estimated Taxes that are required to have been paid) have been paid.  Way to Grow is not currently the beneficiary of any extension of time within which to file any Tax Return (except for automatic extensions obtained in the ordinary course of business).  No claim has ever been made by a Tax authority or other Governmental Authority in a jurisdiction other than Colorado that Way to Grow is or may be subject to taxation by that jurisdiction. Way to Grow does not have an office in, nor own any property in, nor have any employees in any state other than Colorado.

(b)    With respect to any Pre-Closing Tax Period, Way to Grow has made full provision in accordance with US GAAP in its statutory accounts for the payment of all Taxes that are due or are claimed to be due, or may or will become due as a result of activities during such Pre-Closing Tax Period (it being understood that such provision would exclude any liability of Seller for such Taxes included in Seller's income due to the S election).  To the extent that any such Pre-Closing Tax Period Taxes are imposed on Seller, and have not been paid prior to Closing, Seller will pay for such Taxes in a timely manner and Way to Grow will have no post-closing obligation to make a tax distribution to Seller for the payment of such Taxes.

(c)    Since the Balance Sheet Date, Way to Grow has not incurred any liability for Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

26

(d)      No deficiencies for Taxes with respect to Way to Grow or the earnings of Way to Grow have been claimed or assessed by any Tax authority or other Governmental Authority for all taxable years ending on or after December 31, 2012, and there is no existing audit or inquiry of any Tax authority or other Governmental Authority in relation to any such taxable years.  There are no pending or, to the Knowledge of Seller or Way to Grow, threatened, audits, inquiries, assessments or other actions for or relating to any liability in respect of Taxes of Way to Grow. To the Knowledge of Seller and Way to Grow, there are no matters under discussion with any Governmental Authority with respect to Taxes that are likely to result in an additional liability for Taxes with respect to Way to Grow. Seller does not expect any Governmental Authority to assess any additional Taxes for any periods for which Tax Returns have been filed. Way to Grow has delivered to Purchaser complete and accurate copies of all federal, state, local and foreign Tax Returns (and any predecessor thereof) for all taxable years ending on or after December 31, 2012, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by Way to Grow (or any predecessors thereof) since December 31, 2012. Schedule 3.18 indicates any Tax Returns that have been audited. Way to Grow (or any predecessor thereof) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, nor has any request been made in writing for any such extension or waiver.  No power of attorney (other than powers of attorney authorizing employees of Way to Grow to act on behalf of Way to Grow) with respect to any Taxes is in effect with any Tax authority.

(e)      There are no Liens for Taxes upon any property or asset of Way to Grow or upon the Way to Grow Common Stock (other than statutory Liens for current Taxes not yet due and payable).

(f)      Way to Grow will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing Date as a result of any installment sale or other transaction on or prior to the Closing Date, any accounting method change or agreement with any Tax authority entered into on or prior to the Closing Date, the use of an improper method of accounting for any period or portion thereof ending prior to the Closing Date, any prepaid amount received on or prior to the Closing Date or excess loss account created on or prior to the Closing Date or any election under Code Section 108(i).

(g)      Way to Grow is not a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract in respect of any party other than Way to Grow (other than obligations under any Contract or other agreement entered into in the ordinary course of business and not principally concerning Taxes).

(h)      Way to Grow has not participated in nor plans to participate in any Tax amnesty program, or, to the Knowledge of Seller, within the last six years has been party to a transaction that has been required to be disclosed to, or that has required a formal clearance or ruling from, any Tax authority or other Governmental Authority.

(i)      Way to Grow has no liability for the Taxes of any Person other than Way to Grow (i) as a transferee or successor, (ii) by Contract or (iii) otherwise (including, for the avoidance of doubt, as a result of any tax grouping arrangements).

(j)      Way to Grow has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holders of Way to Grow or other Person and all Forms W-2 and 1099 required with respect thereto have been properly completed and filed.

27

(k)    Way to Grow has been, since inception, a validly electing S corporation within the meaning of Sections 1361 and 1362 of the Code.

(l)    Way to Grow is not a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Code Section 280G (or any corresponding provision of state, local or non-U.S. tax law) and (ii) any amount that will not be fully deductible as a result of Code Section 162(m).

(m)    Way to Grow has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code Section 6662.

The representations set forth in this <u>Section 3.18</u> and <u>Section 3.19</u> are the only representations in this Agreement with respect to Taxes and any claim for breach of representation with respect to Taxes will be based on the representations made in this <u>Section 3.18</u> or <u>Section 3.19</u> and, further, none of the representations set forth in this <u>Section 3.18</u> or <u>Section 3.19</u> shall be interpreted as providing any representation, warranty or other assurance regarding the existence, amount, value or condition of any Tax assets or Tax attributes of Way to Grow (including, but not limited to, any Tax loss carryforward, Tax basis of any asset or any Tax method of accounting) or the ability of Purchaser or any of its Affiliates (including, on or after the Closing Date, Way to Grow) to utilize such Tax assets or Tax attributes on or after Closing Date.

**3.19.    Employees and Employee Benefit Plans**.

(a)    Section 3.19(a) of the Disclosure Schedule sets forth, in respect of each Employee, the name, date of birth, date of commencement of employment, the position held and job location, salary, fees or wages, holiday entitlement, bonus and incentive arrangements.

(b)    There is no person whose salary exceeds $60,000 who has accepted an offer of employment or engagement made by Way to Grow whose employment has yet to start and there are no offers of employment for any such employee which have been issued and remain open for acceptance.  At the date of this Agreement, no Employee whose salary exceeds $60,000 (i) has given, to the Knowledge of Seller and Way to Grow, has threatened to give, or received notice terminating his or her office and/or employment (where that notice has not yet expired) or (ii) is under threat of dismissal.  No Employee is absent for a period of, or expected to be, more than four weeks.

(c)    There is no person who is engaged by Way to Grow to provide services personally to it who is not an Employee.

(d)    Seller has made available to Purchaser all current employment policies and staff handbooks pertaining to the Employees.

(e)    Other than routine increases to salary and flexible working requests and the level of benefits (i) during the twelve month period prior to the date of this Agreement there have been no changes to the terms and conditions or benefits of any Employee whose salary equals or exceeds $60,000 per annum and (ii) no changes to terms and conditions or benefits of any Employee have been proposed or agreed in the six months prior to the date of this Agreement or were due to be considered or implemented after the date of this Agreement, except for the Employment Agreements.

(f)      No amounts due to, or in respect of, any Employee or Former Employee are in arrears or unpaid and there are no amounts that have accrued but are not yet due to be paid. Way to Grow has not made any loan or advance to any Employee that is outstanding.

(g)      No Employee or Former Employee is involved in any existing, pending or, to the Knowledge of Seller and Way to Grow, threatened claim or dispute by or in respect of any Employee, Former Employee or employee representative representing any Employee ("Employment Dispute") and has not been involved in any Employment Dispute in the twelve month period prior to the date of this Agreement. To the Knowledge of Seller and Way to Grow, there are no facts or circumstances that could reasonably be expected to result in or be the basis for any Employment Dispute, or that may suggest that any of the provisions of this Agreement may lead to any Employment Dispute.

(h)      Since inception, Way to Grow has complied in all material respects with all Applicable Laws and codes of practice in respect of each Employee and Former Employee. Way to Grow has not at any time discriminated against or caused any Employee to suffer any detriment on the grounds of sex, gender, sexual orientation, age, race, religion, belief, disability, hours that they work, temporary nature of their employment, membership of a trade union or status as an employee representative or otherwise in contravention of any legislation.

(i)      Except for Pension Plans, Way to Grow has not or could not have any liability in respect of any plan providing Pension Benefits or is obliged to provide, participate in or contribute towards any Pension Benefits for any Person. Except as is set forth in the Pension Plans, no promise, assurance or undertaking has been given as to the provision of Pension Benefits. Seller has made available to Purchaser the plans, summaries or other descriptions of any employee benefit arrangement sponsored by Seller and subject to ERISA.

(j)      There are not in respect of the Pension Plans any disputes, actions or claims by any person (other than routine claims for benefits) outstanding, pending or, to the Knowledge of Seller or Way to Grow, threatened against the administrators of the Pension Plans or Way to Grow.

(k)      The Pension Plan has in all material respects been administered and maintained in accordance with the requirements of ERISA and the Code.

(l)      Except as would not have a Material Adverse Effect: (i) no proposal or announcement has been made to any Employee about the introduction, continuance, increase or improvement of any Pension Benefits, and (ii) Way to Grow does not have any legal obligation to pay Pension Benefits to or in respect of any person who is not an Employee or Former Employee, except to the extent available under the Pension Plans.

**3.20.   Environmental Matters**.

(a)      Except as would not reasonably be expected to be, individually or in the aggregate, material to Way to Grow:

(i)      no written notice, notification, demand, request for information, citation, summons or order has been received, no complaint has been filed, no penalty has been assessed, and no Proceeding (or any basis therefor) is pending or, to the Knowledge of Seller and Way to Grow, is threatened by any Governmental Authority or other Person relating to Way to Grow and relating to or arising out of any Environmental Law;

(ii)     Way to Grow is, and has at all times since inception been, in material compliance with all Environmental Laws and all Environmental Permits, and to the Knowledge of Seller and Way to Grow, no circumstances exist on the date hereof that will require any material capital expenditures to be incurred within one year of the date of this Agreement in order to ensure compliance with Environmental Laws and all Environmental Permits; and

(iii)     to the Knowledge of Seller and Way to Grow, there are no liabilities or obligations of Way to Grow of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise arising under or relating to any Environmental Law or any Hazardous Substance and, to the Knowledge of Seller and Way to Grow, there is no condition, situation or set of circumstances that could reasonably be expected to result in or be the basis for any such liability or obligation.

(b)     Way to Grow (and the Way to Grow Real Property) are not individually or cumulatively required to participate in any form of climate change or emissions reduction, record keeping, conservation or trading scheme.

(c)     There has been no environmental investigation, study, audit, test, review or other analysis conducted of which Seller and Way to Grow have Knowledge in relation to the current or prior business of Way to Grow or any property or facility now or previously owned or leased by Way to Grow that has not been made available to Purchaser.

(d)     For purposes of this Section 3.20, Way to Grow shall include any entity that is, in whole or in part, a predecessor of Way to Grow.

**3.21.     Significant Customers and Suppliers; Product Liability**.

(a)     Section 3.21(a) of the Disclosure Schedule sets forth an accurate and complete breakdown of the revenues received from the 10 largest customers of Way to Grow, by revenue for each of the calendar years 2014 and 2013 and the first three fiscal quarters of 2015.  Neither Seller nor Way to Grow has received any written notice or other written communication indicating that any of the customers listed in Section 3.21(a) of the Disclosure Schedule may cease dealing with Way to Grow or may otherwise reduce the volume of business transacted by such Person with Way to Grow below historical levels.

(b)     Section 3.21(b) of the Disclosure Schedule sets forth an accurate and complete list of the 10 largest suppliers of each of Way to Grow, by revenue for the calendar years 2014 and 2013 and the first three fiscal quarters of 2015. Neither Seller nor Way to Grow has received any written notice or other written communication indicating that any of the suppliers listed in Section 3.21(b) of the Disclosure Schedule may cease acting as a supplier to Way to Grow or otherwise dealing with Way to Grow.

(c)     Since inception, all Way to Grow Products that Way to Grow owns, develops, manufactures or licenses are and were free from material defects in construction and design. There are no claims, causes of action, suits, inquiries (in writing), allegations (in writing), or written complaints with respect to the failure of (i) any Way to Grow Product to meet or otherwise materially satisfy the terms of any Contract or specification, including warranty-related obligations, or (ii) Way to Grow to take reasonable care in the design, development, research, manufacture, supply, marketing, sale, distribution, support and maintenance of Way to Grow Products pending or, to the Knowledge of the Seller and Way to Grow, threatened in writing by any Person, against the Seller or Way to Grow relating to any Way to Grow Product.  Since inception, there has not been, nor is there under consideration by the Seller or Way to Grow, any

30

Way to Grow Product recall or post-sale warning conducted by or on behalf of the Seller or Way to Grow concerning any Way to Grow Product.

**3.22.  Accounts Receivable.** Section 3.22(a) of the Disclosure Schedule sets forth an accurate and complete breakdown and aging of all accounts receivable, notes receivable and other receivables of Way to Grow as of August 31, 2015. All existing accounts receivable of Way to Grow (including those accounts receivable reflected on the Unaudited Year End Balance Sheet that have not yet been collected and those accounts receivable that have arisen since the Balance Sheet Date and have not yet been collected) (a) represent and will represent valid obligations of customers of Way to Grow arising from bona fide transactions entered into in the ordinary course of business and (b) are current and, to the Knowledge of Seller and Way to Grow, will be collected in full when due, without any counterclaim or set off (net of the respective reserves shown on the Unaudited Year End Balance Sheet and other than normal cash discounts accrued in the ordinary course of business consistent with past practice), and, with respect to accounts receivable that have arisen since the Balance Sheet Date, net of reserves that will be established with respect to such receivables consistent with past practices, which reserves are adequate and calculated consistent with past practice of Seller and Way to Grow.  Subject to such reserves, to the Knowledge of Seller and Way to Grow, each of such accounts receivable either has been or will be collected in full, without any counterclaim or setoff (other than normal cash discounts accrued in the ordinary course of business consistent with past practice), within 90 days after the day on which it first becomes due and payable.

**3.23.  Affiliate Transactions.**   No director, officer, employee, Affiliate or "associate" or members of any of their "immediate family" (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the Exchange Act) of Way to Grow (each of the foregoing, a "Related Person"), other than in its capacity as a director, officer or employee of Way to Grow (a) is involved, directly or indirectly, in any business arrangement or other relationship with any Affiliate of Way to Grow (whether written or oral), (b) directly or indirectly owns, or otherwise has any right, title, interest in, to or under, any property or right, tangible or intangible, that is used by Way to Grow or (c) is engaged, directly or indirectly, in any business that competes with the Business.  In addition, to the Knowledge of Seller and Way to Grow, no Related Person has an interest in any Person that competes with the business of Way to Grow in any market presently served by Way to Grow (except for ownership of less than one percent of the outstanding capital stock of any corporation that is publicly traded on any recognized stock exchange or in the over-the-counter market).

**3.24.  Finders' Fees.** There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller or Way to Grow who might be entitled to any fee or commission from Seller or Way to Grow, or any Affiliates of Seller or Way to Grow in connection with the Transaction.

**3.25.  No Other Representations and Warranties.**   Except for the representations and warranties contained in this Article III (including the related portions of the Disclosure Schedule), none of Seller, or Way to Grow, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, or Way to Grow, including any representation or warranty as to the accuracy or completeness of any information, regarding Way to Grow furnished or made available to Purchaser and its Representatives or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in Applicable Law.

**4.**

**Representations and Warranties of Purchaser**

31

Except as set forth in the Disclosure Schedule, Purchaser represents and warrants to Seller and Way to Grow that:

**4.1.    Corporate Existence and Power.**

(a)    Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power and authority to carry on its business as now conducted. Purchaser is duly qualified to do business as a foreign corporation or other entity and is in good standing in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    Purchaser has made available to Seller and Way to Grow accurate and complete copies of: (i) the Organizational Documents of Purchaser; and (ii) the stock records of Purchaser. There has not been any violation of any of the provisions of the Organizational Documents of Purchaser, and Purchaser has not taken any action that is inconsistent in any material respect with any resolution adopted since inception by the stockholders of Purchaser, the board of directors of Purchaser or any committee thereof.

(c)    The Subsidiaries of Purchaser are set forth in Schedule 4.01(c).

**4.2.    Corporate Authorization.**  Purchaser has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement; and the execution, delivery and performance by Purchaser of this Agreement has been duly authorized by all necessary action on the part of Purchaser.  Assuming the due authorization, execution and delivery of this Agreement by Seller and Way to Grow, this Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to (a) laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (b) rules of law governing specific performance, injunctive relief and other equitable remedies.

**4.3.    Governmental Authorization.**  The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby require no action by or in respect of, or filing with, any Governmental Authority, other than (a) compliance with any applicable requirements of the Securities Act, the Exchange Act and any other U.S. state or federal securities laws or the laws of any national securities exchange, and (b) any actions or filings the absence of which would not be reasonably expected to materially impair the ability of Purchaser to consummate the Transaction.

**4.4.    Non-contravention.**  The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Organizational Documents of Purchaser or (b) assuming compliance with the matters referred to in Section 4.03, contravene, conflict with or result in a violation or breach of any provision of any material Applicable Law.

**4.5.    Capitalization.**

(a)    The issued and outstanding capital stock of Purchaser is as set forth in Section 4.05(a) of the Disclosure Schedule, all of which are owned free and clear of any Liens.  All outstanding shares of Purchaser Common Stock have been duly authorized and validly issued and are fully paid and non-assessable.  Except as set forth on Section 4.05(a) of the Disclosure Schedule, there are no shares of Purchaser Common Stock that remain subject to vesting or forfeiture restrictions. Except as otherwise set forth above, there are no outstanding (i) shares of capital stock or voting

32

securities of Purchaser, (ii) securities of Purchaser convertible into or exchangeable for shares of Purchaser or voting securities of Purchaser or (iii) options or other rights to acquire from Purchaser, or other obligation of Purchaser to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of Purchaser. A capitalization table of Purchaser is set forth on Section 4.05(a) of the Disclosure Schedule.

(b)     All outstanding shares of Purchaser Common Stock have been issued and granted in material compliance with (i) all applicable securities laws and other Applicable Laws and (ii) all requirements set forth in applicable Contracts.

(c)     Purchaser has never repurchased, redeemed or otherwise reacquired any shares of its capital stock and there are no outstanding rights or obligations of Purchaser to repurchase or redeem any of its securities.

**4.6.     Financial Statements.**

(a)     Purchaser has made available to Way to Grow Purchaser's audited consolidated balance sheets as of December 31, 2014, and the related audited consolidated profit and loss accounts for the year ended December 31, 2014, and the unaudited consolidated balance sheets as of September 30, 2015, and the related unaudited consolidated profit and loss accounts for the nine-months ended September 30, 2015 (collectively, the "Purchaser Financial Statements").

(b)     The Purchaser Financial Statements (i) have been prepared from the books and records of Purchaser, (ii) complied as to form in all material respects with applicable accounting requirements with respect thereto as of their respective dates, (iii) have been prepared in accordance with US GAAP applied on a consistent basis throughout the periods indicated and consistent with each other, and (iv) give a true and fair view, in accordance with US GAAP, of the financial position of Purchaser at the dates therein indicated and the results of operations of Purchaser for the periods therein specified (subject, in the case of unaudited financial statements for the nine-months ended September 30, 2015, to the absence of notes and normal year-end audit adjustments, none of which individually or in the aggregate will be material in amount).

(c)     The books of account and other financial records of Purchaser have been kept in the ordinary course of business consistent with Applicable Laws in all material respects, the transactions entered therein represent bona fide transactions, and the revenues, expenses, assets and liabilities of Purchaser have been recorded therein in all material respects.  Purchaser has established and maintained a system of internal accounting controls to provide reasonable assurances (i) that transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with US GAAP and (B) to maintain accountability for assets, (ii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of Purchaser, (iii) that the amount recorded for assets on the books and records of Purchaser are compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences and (iv) that accounts, notes and other receivables and inventory are recorded in all material respects, and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

**4.7.     Compliance with Applicable Laws.**  Purchaser is, and has at all times since inception been, in material compliance with, and to the Knowledge of Purchaser is not, and at no time since inception has been, under investigation with respect to or threatened to be charged with or given notice of any violation of, any Applicable Law.

**4.8.     Tax Matters.**

33

(a)      Purchaser has duly and timely filed with the appropriate Tax authorities all Tax Returns required to be filed for all taxable years ending on or after December 31, 2012.  All such Tax Returns are complete and accurate in all material respects.  All Taxes due and owing by Purchaser (whether or not shown on any Tax Returns and including estimated Taxes that are required to have been paid) have been paid.  Purchaser is currently not the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by a Tax authority or other Governmental Authority in a jurisdiction where Purchaser does not file Tax Returns that Purchaser is or may be subject to taxation by that jurisdiction.

(b)      With respect to any Pre-Closing Tax Period, Purchaser has made full provision in accordance with US GAAP in its statutory accounts for the payment of all Taxes that are due or are claimed to be due, or may or will become due as a result of activities during such Pre-Closing Tax Period. Since the Balance Sheet Date, Purchaser has not incurred any liability for Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

(c)      No deficiencies for Taxes with respect to Purchaser have been claimed or assessed by any Tax authority or other Governmental Authority for all taxable years ending on or after December 31, 2012, and there is no existing audit or inquiry of any Tax authority or other Governmental Authority in relation to any such deficiencies.   There are no pending or, to the Knowledge of Purchaser, threatened, audits, inquiries, assessments or other actions for or relating to any liability in respect of Taxes of Purchaser.   To the Knowledge of Purchaser, there are no matters under discussion with any Tax authority with respect to Taxes that are likely to result in an additional liability for Taxes with respect to Purchaser.  Purchaser has delivered or made available to Way to Grow and Seller complete and accurate copies of all federal, state, local and foreign Tax Returns (and any predecessor thereof) for all taxable years ending on or after December 31, 2012, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by Purchaser (or any predecessors thereof) since December 31, 2012.  Purchaser (or any predecessor thereof) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, nor has any request been made in writing for any such extension or waiver.  No power of attorney (other than powers of attorney authorizing employees of Purchaser to act on behalf of Purchaser) with respect to any Taxes is in effect with any Tax authority, and each employee of Purchaser who is authorized to act on behalf of Purchaser with respect to any Taxes is identified on Section 4.09(c) of the Disclosure Schedule.

(d)      There are no Liens for Taxes upon any property or asset of Purchaser (other than statutory Liens for current Taxes not yet due and payable).

(e)      Purchaser will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing Date as a result of any installment sale or other transaction on or prior to the Closing Date, any accounting method change or agreement with any Tax authority, the use of an improper method of accounting for any period or portion thereof ending prior to the Closing Date, any prepaid amount received on or prior to the Closing or excess loss account.

(f)      Purchaser is not a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract in respect of any party other than Purchaser.

(g)      Purchaser has not participated in nor plans to participate in any Tax amnesty program, or within the last six years has been party to a transaction that Purchaser has been required to be disclosed to, or that has required a formal clearance or ruling from, any Tax authority or other Governmental Authority.

34

(h)     Purchaser has no liability for the Taxes of any Person other than Purchaser (i) as a transferee or successor, (ii) by Contract or (iii) otherwise (including, for the avoidance of doubt, as a result of any tax grouping arrangements).

(i)     Purchaser has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holders of Purchaser or other Person.

**4.9.    Finders' Fees**.   With the exception of Spartan Capital Securities, LLC, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Purchaser who might be entitled to any fee or commission from Purchaser or any of its Affiliates in connection with the Transaction.

**4.10.    Financial Ability**.   On the Closing Date, Purchaser will have available cash or other sources of immediately available funds sufficient to pay or cause to be paid the Cash Payment and the other amounts payable by Purchaser pursuant to Section 2.02(b), in each case in accordance with the terms of this Agreement.

**4.11.    Litigation**.   There are no actions, suits, claims, investigations or other legal proceedings pending or threatened in writing against or by Purchaser or any Affiliate of Purchaser that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.   There is no material order, writ, injunction, directive, restriction, judgment or decree to which Purchaser, or any of the assets owned or used by Purchaser, is subject or which restricts in any respect the ability of Purchaser to conduct its business. To the Knowledge of Purchaser, no officer or other employee of Purchaser is subject to any order, writ, injunction, judgment or decree that prohibits such officer or other employee from engaging in or continuing any conduct, activity or practice relating to the business of Purchaser.

5.

<strong>Covenants of Seller and Way to Grow</strong>

**5.1.    Payoff Letters; Invoices; and Lien Releases**.   Seller shall use commercially reasonable efforts to obtain and deliver to Purchaser no later than two Business Days prior to the Closing Date, an accurate and complete copy of: (a) a payoff letter, dated no more than three Business Days prior to the Closing Date, with respect to all Closing Indebtedness, if any, Way to Grow owed to such lender and the estimated amounts payable to the lender thereof to (i) satisfy such Closing Indebtedness as of the Closing and (ii) terminate and release any Liens related thereto (each, a "Payoff Letter"), or such other appropriate documentation with respect to the satisfaction and cancelation of all Closing Indebtedness; (b) an invoice from each advisor or other service provider to Way to Grow, dated no more than three Business Days prior to the Closing Date, with respect to Way to Grow Transaction Expenses estimated to be due and payable to such advisor or other service provider, as the case may be, as of the Closing Date (each, an "Invoice"); and (c) to the extent not delivered in connection with a Payoff Letter, written instruments terminating and releasing any Lien on (i) any property or assets of Way to Grow or used in the Business or (ii) the Way to Grow Common Stock or any other securities of Way to Grow (each, a "Lien Release").

**5.2.    Indemnification of Officers and Directors**. Purchaser and PSub1 agree that all rights to indemnification by Way to Grow for acts or omissions occurring prior to the Effective Time existing as of the date of this Agreement in favor of the current and former directors and officers of Way to Grow shall survive the Mergers and shall continue in full force and effect in accordance with their terms following the Effective Time, and Purchaser shall cause the Surviving Entity to fulfill and honor such obligations to the maximum extent permitted by Applicable Law.

35

6.

**Additional Covenants of the Parties**

**6.1.     Appropriate Action; Consents.**

(a)      Seller, and Way to Grow and Purchaser shall, and Seller shall cause Way to Grow to, use commercially reasonable efforts to: (i) take, or cause to be taken, all appropriate action and do, or cause to be done, and to assist and cooperate with the other parties hereto in doing all things necessary, proper or advisable under Applicable Law or otherwise to consummate and make effective the Transaction as promptly as practicable; and (ii) obtain from any Governmental Authority any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained by Way to Grow, or to avoid any Proceeding by any Governmental Authority, in connection with the authorization, execution and delivery of this Agreement and the consummation of the Transaction.  The parties shall furnish to each other all information required for any application or other filing under the rules and regulations of any Applicable Law in connection with the Transaction.

(b)      The parties shall give any notices to third parties, and use, their commercially reasonable efforts to obtain any third party consents, (i) necessary, proper or advisable to consummate the Transaction, (ii) required to be disclosed in the Disclosure Schedule or (iii) required to prevent a Material Adverse Effect from occurring prior to or after the Closing.

**6.2.     Public Announcements**.   Without limiting any other provision of this Agreement, each of Purchaser and Seller shall consult with the other prior to issuing any press release with respect to the execution of this Agreement.  Thereafter, neither Seller, Way to Grow nor Purchaser, shall issue any press release or other announcement (to the extent not previously publicly disclosed or made in accordance with this Agreement) with respect to this Agreement, the Transaction or any Acquisition Proposal without the prior consent of the other parties hereto (such consent not to be unreasonably withheld, conditioned or delayed), except as such press release or other announcement may be required by Applicable Law or the applicable rules of a national securities exchange, in which case the party required to issue the release or make the announcement shall use its commercially reasonable efforts to provide the other party with a reasonable opportunity to review and comment on such release or announcement in advance of its issuance.

**6.3.     Preservation of Records**.   Seller, Purchaser and PSub1 agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the respective businesses of Way to Grow for a period of three years from the Closing Date and shall make such records and personnel available, during normal business hours upon reasonable notice and in a manner so as to not unreasonably interfere with the conduct of business, to the other as may be reasonably requested by such party in accordance with this Section 6.04.  Requests may be made under this Section 6.04 only to (a) facilitate the preparation for or the prosecution, defense, or disposition of any Proceeding (other than any Proceeding between or among any of the parties hereto or any Indemnitee) or (b) prepare and file other documents or reports required by any Governmental Authority.   Notwithstanding anything herein to the contrary, neither party shall be required to make any such records or personnel available to the extent such party determines, in its reasonable judgment (after consultation with outside legal counsel), that doing so would (i) violate Applicable Law, (ii) breach a Contract or obligation of confidentiality owing to a third party or (iii) constitute a waiver of attorney-client privilege (it being agreed that such party shall give notice to the other party of the fact that it is withholding such information or documents pursuant to clauses (i) through (iii) above and thereafter the parties shall reasonably cooperate (including by entering into a joint defense or similar agreement) to cause such information to be provided in a manner that would not reasonably be expected to waive the applicable privilege or protection or violate the applicable restriction).  Seller shall not have access to personnel records

36

of Way to Grow relating to individual performance or evaluation records, medical histories or other information, the disclosure of which would result in the violation of Applicable Law. In the event Seller or Purchaser wishes to destroy such records after that time, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 90-day period, to take possession of the records within one hundred eighty (180) days after the date of such notice.

**6.4.    Benefits After Closing**. After the Closing Date, Way to Grow will use its commercially reasonable efforts to continue offering to its employees similar benefits to those in place with Way to Grow prior to the Closing Date.

**6.5.    Audit of Way to Grow.** The audit of Way to Grow's Financial Statements is being conducted by a PCAOB independent auditor (the "Audit"). Way to Grow and Seller agree to take all commercially reasonable measures to cooperate with respect to the Audit so that it may be completed as soon as is practicable.

**7.**
Tax Matters

**7.1.    Final "S" Corporation Tax Return**. Seller and Purchaser (a) acknowledge that Way to Grow is presently operated as an "S" corporation for income Tax purposes, and that such "S" corporation status will be revoked as of the Closing, and (b) agree that Seller will be responsible for and will have authority to file the final federal and Colorado (and other applicable state) "S" corporation income Tax Returns for the period beginning January 1, 2015 and ending on the date of the Closing, and that Seller will file such Tax Returns, provided that Seller will provide Purchaser a draft copy of such final Tax Returns for review and comment before filing the same (provided, however, and for the avoidance of doubt, that while Seller shall discuss any comments with Purchaser, Seller shall not be required to reflect any such comments on such Tax Returns in Seller's sole discretion). To the extent a Tax Return is governed by both this Section 6.06 and Section 7.01 or Section 7.02 then this Section 6.05 shall control. The Surviving Corporation shall file such Tax Returns prepared in accordance with this Section 7.01 if required by Applicable Law.

**7.2.    Tax Periods Ending on or before the Closing Date.** To the extent not filed prior hereto, Seller shall prepare or cause to be prepared, in accordance with Applicable Law and consistent with past practice, each Tax Return required to be filed with respect to Way to Grow for a Pre-Closing Tax Period. At least 20 days prior to the date on which any such Tax Return is due (after taking into account any valid extension), but not within fewer than five (5) days after the date hereof, Way to Grow, or Seller, as applicable, shall deliver such Tax Return to Purchaser. No later than five days prior to the date on which such Tax Return for a Pre-Closing Tax Period is due (after taking into account any valid extension), Purchaser, after reasonable consultation with Seller, may make reasonable changes and revisions to such Tax Return. Way to Grow shall not file such Tax Return without the consent of the Purchaser, which shall not be unreasonably withheld, conditioned or delayed. To the extent not filed prior to the Closing Date, Way to Grow shall file or cause to be filed each Tax Return required to be filed with respect to Way to Grow for a Pre-Closing Tax Period.

**7.3.    Straddle Periods.** Purchaser shall prepare each Tax Return required to be filed with respect to Way to Grow for any Straddle Period, in accordance with Applicable Law and consistent with past practice. At least 20 days prior to the date on which any such Tax Return for a Straddle Period is due (after taking into account any valid extension), Purchaser shall deliver such Tax Return to Seller. No later than five days prior to the date on which any such Tax Return for any Straddle Period is due (after taking into account any valid extension), Way to Grow, after

reasonable consultation with Purchaser, may make reasonable changes and revisions to such Tax Return as are requested by Seller. Purchaser shall file or cause to be filed each Tax Return required to be filed with respect to Way to Grow for a Straddle Period.

**7.4. Straddle Period Allocations.** For purposes of this Section 7.04 and Section 9.02(e), the portion of any Tax that relates to the portion of any Straddle Period ending on the Closing Date shall be determined as follows: (i) with respect to franchise, property or other ad valorem Taxes, the amount allocable to the portion of the period ending on the Closing Date shall equal the amount of such property Taxes for such entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the portion of such Straddle Period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period; and (ii) with respect to all other Taxes, the amount allocable to the portion of the period ending on the Closing Date shall be determined based on an actual closing of the books used to calculate such Taxes as if such tax period ended as of the close of business on the Closing Date. In the case of clause (ii), exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed as if the Closing Date was the last day of the Straddle Period) shall be allocated between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period thereafter in proportion to the number of days in each such portion.

**7.5. Cooperation on Tax Matters.** Purchaser, Seller and Way to Grow shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Agreement and any Tax Contest. Such cooperation shall include the retention and (upon the other party's request) access to (and ability to copy) the records and information which may be reasonably relevant to any such Tax Contest and making appropriate persons available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Purchaser, Seller and Way to Grow shall retain all books and records with respect to Tax matters pertinent to Way to Grow relating to any Taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified, any extensions thereof) of the respective Taxable periods, and to abide by all record retention agreements entered into with any Taxing authority. Additionally, unless required by Applicable Law, without the prior written consent of the Seller (such consent not to be unreasonably withheld, conditioned or delayed), neither the Purchaser nor any of its Affiliates (including after the Closing Date, Way to Grow) shall take any action outside the ordinary course of business with respect to Way to Grow that could reasonably be respected to materially increase the Tax liability of Way to Grow or the Seller for any Pre-Closing Tax Period or the portion of a Straddle Period ending on the Closing Date.

**7.6. Contest Provisions.** If, subsequent to the Closing, Purchaser or Way to Grow receives notice of a Tax Contest with respect to any Tax Return of Way to Grow for a Pre-Closing Tax Period (a "Pre-Closing Return") with respect to which Indemnitees may claim a right to indemnification under this Agreement, then within 10 days after receipt of such notice, Purchaser shall notify Seller of such notice; provided, however, that any failure on the part of Purchaser to so notify Seller shall not limit any of the obligations of Seller under Article 9 (except to the extent such failure materially prejudices the Seller). Purchaser shall have the right to control the conduct and resolution of such Tax Contest, provided that (1) Seller may participate in such claim with counsel of its choice, (2) Purchaser shall keep Seller reasonably informed of all material developments on a timely basis, (3) Purchaser shall consider in good faith any comments provided by the Seller in connection with the conduct and resolution of such Tax Contest and (4) Purchaser shall not resolve such Tax Contest in a manner that could reasonably be expected to have an adverse impact on Way to Grow's indemnification obligations under this Agreement without Seller's written consent, which consent shall not be unreasonably withheld. "Tax

38

Contest" means any audit, other administrative proceeding or inquiry by a Government Authority, or judicial proceeding, in each case relating to the relevant Tax Return.

**7.7.    Characterization of Payments.**  Any indemnity payments made pursuant to Article 9 shall constitute an adjustment of the Aggregate Consideration paid by Purchaser pursuant to this Agreement for Tax purposes and shall be treated as such by all parties on their Tax Returns to the extent permitted by law.    For the avoidance of doubt, any payments of the Aggregate Consideration whether paid before or after the Closing Date (including the Initial Payment) shall be treated shall be treated as adjustments to the purchase price paid by Purchaser pursuant to this agreement for Tax purposes and shall be treated as such by all parties on their Tax Returns to the extent permitted by law.

**7.8.    Treatment of Mergers.** The parties intend that the First Merger, together with the Second Merger, be treated together as a Reorganization and that this Agreement constitute a "plan of reorganization" within the meaning of section 1.368-2(g) of the regulations promulgated under the Code.  Each party hereto (and their Affiliates) shall prepare all Tax Returns consistently with such intent and no party shall take any action inconsistent with such intent, unless agreed to beforehand in writing by the Purchaser and the Seller.   Notwithstanding the foregoing, Purchaser makes no representations or warranties to Way to Grow or the Seller regarding the Tax treatment or any of the Tax consequences to the Company or the Seller of the other transactions contemplated hereby, including the First Merger or the Second Merger.

**7.9.    Certain Post-Closing Conduct of the Business.**  Purchaser covenants and warranties to the Seller that Purchaser shall either continue the Way to Grow's historic business or use a significant portion of the Way to Grow's historic business assets in a business (or Purchaser is treated as doing so, within the scope of Treasury Regulations 1.368-1(d)(4)), all within the meaning of Treasury Regulations 1.368-1(d)(1).

**7.10.    Transfer Taxes.**    All transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with the Transaction and this Agreement shall be borne by Purchaser.  Purchaser will file, and Seller and Way to Grow shall cooperate in the preparation and filing of, all necessary Tax returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

**8.**

**Closing Conditions**

**8.1.    Conditions to the Obligations of Each Party.**  The obligations of Seller, Way to Grow, Purchaser and PSub1 to consummate the Transaction are subject to the satisfaction of the following conditions:

(a)    Governmental Approvals.  All notices to, filings with and Consents of Governmental Authorities required to be made or obtained under any Applicable Law in connection with the execution, delivery and performance of this Agreement and the consummation of the Transaction shall have been made or obtained and be in full force and effect.

(b)    No Injunction.  No temporary restraining order, preliminary or permanent injunction or other order or decree issued by any Governmental Authority of competent jurisdiction shall be in effect which prevents the consummation of the Transaction on the terms contemplated herein, and no Applicable Law shall have been enacted or be deemed applicable to the Transaction that makes illegal consummation of the Transaction.

39

(c) _Agreement_.  Purchaser, PSub1, PSub2, Way to Grow and the Seller shall execute and deliver to the other parties this Agreement.

(d) _Sales Tax_.  Purchaser and Seller shall mutually agree on the payment of any pre-Closing Colorado sales tax liabilities, if any.

**8.2.    Conditions to the Obligations of Purchaser**.  The obligations of Purchaser, PSub1 and PSub2 to consummate the Transaction are subject to the satisfaction, at or prior to the Closing, of the following further conditions:

(a) _Representations and Warranties_.  Each of (i) the Fundamental Representations shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on the Closing Date (except for Fundamental Representations that speak as of a particular date, which shall be true and correct in all respects as of such date) and (ii) the other representations and warranties made by Seller in this Agreement shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the Closing Date as if made as of the Closing Date (except for representations and warranties that speak as of a particular date, which shall be accurate in all material respects as of such date), in the case of this clause "(ii)", without giving effect to any Material Adverse Effect or other materiality qualifications, or any similar qualifications, contained or incorporated directly or indirectly in such representations and warranties.

(b) _Way to Grow Stockholder Approval_.  The stockholders of Way to Grow shall have approved the Transaction, this Agreement and the First Merger.

(c) _Covenants_.  Each of the covenants and obligations that Seller or Way to Grow is required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

(d) _Consents_.  Each of the Consents set forth in Schedule 8.02(d) shall have been obtained in form and substance reasonably satisfactory to Purchaser and shall be in full force and effect.

(e) _No Material Adverse Effect_.  Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(f) _Executed Agreements and Certificates_.  Purchaser shall have received the following agreements and documents, each of which shall be in full force and effect:

(i) a certificate pursuant to U.S. Treasury Regulations section 1.1445-2(b), in a form reasonably acceptable to Purchaser, duly executed and acknowledged by Seller;

(ii) (A) Payoff Letters from each creditor to which Closing Indebtedness is owed as of the Closing Date, each in form and substance satisfactory to Purchaser, or such other appropriate documentation with respect to the satisfaction and cancelation of Closing Indebtedness; (B) invoices from each Person with Way to Grow Transaction Expenses have been incurred and remain unpaid as of the Closing Date, and (C) Lien Releases in accordance with Section 5.05;

(iii) a certificate of a secretary or assistant secretary, or equivalent officer, of Way to Grow certifying copies of (A) Way to Grow's charter documents as certified by the Secretary of State (or equivalent Governmental Authority) of its jurisdiction of incorporation, and bylaws, each as amended, and (B) the resolutions of Way to Grow authorizing the execution, delivery and

40

performance of this Agreement, the First Merger and the Transaction  and the incumbency and signatures of officers of Seller and Way to Grow executing this Agreement;

(iv)    a certificate executed on behalf of Way to Grow by its President (the "Seller Closing Certificate") and containing representations and warranties of Way to Grow (A) to the effect that the conditions set forth in Sections 8.02(a), 8.02(c), 8.02(e), 8.02(g), 8.02(h) and 8.02(i) have been duly satisfied, (B) specifying the total amount of the Closing Indebtedness (and attaching thereto an accurate and complete copy of each executed Payoff Letter not previously delivered to Purchaser or such other appropriate documentation with respect to the satisfaction and cancelation of all Closing Indebtedness), and (C) specifying the total amount of Way to Grow Transaction Expenses (and attaching thereto an accurate and complete copy of each Invoice not previously delivered to Purchaser); and

(v)    all of the statutory and other books (duly written up to date) of Way to Grow and all certificates of incorporation, certificates of incorporation on change of name and common seals or such equivalent items in the relevant jurisdiction as are kept by Way to Grow or required to be kept by Applicable Law.

(g)    Related Party Transactions.  All Contracts between Way to Grow, on the one hand, and any Related Person, on the other hand, (other than ordinary course agreements relating to employee compensation and benefits that have been made available to Purchaser) shall have been terminated.

(h)    Litigation.   There shall not be pending or threatened by or before any Governmental Authority any Proceeding that (i) seeks to prevent the consummation of the Transaction on the terms, and conferring upon Purchaser all of their respective rights and benefits, contemplated herein, or (ii) seeks the award of Damages (in an amount material to Way to Grow) payable by, or any other remedy against, Purchaser if the Transaction is consummated.

(i)    Key Employee Agreements.  The Employment Agreements executed by each of the Key Employees shall be in full force and effect, and to the Knowledge of Seller, no Key Employee shall have evidenced any intention to terminate employment or, with Purchaser or Way to Grow following the Closing.

**8.3.    Conditions to the Obligations of Seller**.  The obligations of Seller to consummate the Transaction are subject to the satisfaction, at or prior to the Closing, of the following further conditions:

(a)    Representations and Warranties.  Each of (i) the Fundamental Representations shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on the Closing Date (except for Fundamental Representations that speak as of a particular date, which shall be true and correct in all respects as of such date) and (ii) the other representations and warranties made by Purchaser in this Agreement shall be accurate in all material respects as of the Closing Date as if made as of the Closing Date (except for representations and warranties that speak as of a particular date, which shall be accurate in all material respects as of such date), in the case of this clause "(ii)", without giving effect to any Material Adverse Effect or other materiality qualifications, or any similar qualifications, contained or incorporated directly or indirectly in such representations and warranties.

(b)    Covenants.  Each of the covenants and obligations that Purchaser is required to comply with or to perform at or prior to the Closing shall have been complied with and performed in all material respects.

41

(c)    Executed Agreements and Certificates.    Seller shall have received the following agreements and documents, each of which shall be in full force and effect:

(i)    a certificate executed on behalf of Purchaser by its authorized representative and containing the representation and warranty of Purchaser that the conditions set forth in Sections 8.03(a) and 8.03(b) have been duly satisfied (the "Purchaser Closing Certificate"); and

(ii)    a certificate of a secretary or assistant secretary, or equivalent officer, of Purchaser certifying copies of the resolutions of the board of directors of Purchaser that the fair market value of the Payment Shares issued to the Seller is $2.00 per share.

(d)    Litigation.    There shall not be pending or threatened by or before any Governmental Authority any Proceeding that seeks to prevent the consummation of the Transaction on the terms contemplated herein.

(e)    Payment.  Purchaser shall have delivered to Seller (i) cash in an amount equal to the Cash Payment by wire transfer in immediately available funds, to an account or accounts designated at least two Business Days prior to the Closing Date by Seller in a written notice to Purchaser (ii) the executed Seller Note and any schedules and exhibits related thereto and (iii) the Payment Shares.

(f)    Purchaser Disclosure Schedules.  Purchaser shall have provided to Seller the Purchaser's Disclosure Schedules, in form and substance satisfactory to Seller.

**9.**

**Indemnification**

**9.1.    Survival of Representations, Etc.**

(a)    The representations and warranties and other obligations made by Seller and Purchaser in this Agreement shall survive the Closing until the date that is twelve (12) months following the Closing Date (the "Expiration Date").  Notwithstanding the foregoing, if at any time prior to the Expiration Date any Indemnitee delivers to Seller or Purchaser, as applicable, a written notice alleging the existence of an inaccuracy in or a breach of any of such representation, warranty, covenant or other obligation and asserting a claim for recovery under Section 9.02 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive until such time as such claim is fully and finally resolved. Notwithstanding the foregoing, all representations and warranties made by Seller and Purchaser in this Agreement shall survive indefinitely in the event of fraud or willful or intentional misrepresentation by Seller, Purchaser, or any of Seller's or Purchaser's Representatives.

(b)    The representations, warranties, covenants and obligations of Seller and Purchaser, and the rights and remedies that may be exercised by the Indemnitees, shall not be limited or otherwise affected by or as a result of any information furnished or made available to, or any investigation made by or knowledge of, any of the Indemnitees or any of their Representatives.

(c)    For purposes of this Agreement, each statement or other item of information set forth in the Disclosure Schedule shall be deemed to be a representation and warranty made by Seller or Purchaser, as applicable, in this Agreement.

(d)    The parties acknowledge and agree that if Way to Grow suffers, incurs or otherwise becomes subject to any Damages as a result of or in connection with any inaccuracy in or breach of any representation, warranty, covenant or obligation, then (without limiting any of the rights of

42

such Way to Grow as an Indemnitee) Purchaser shall also be deemed, by virtue of its ownership of the stock of Way to Grow, to have incurred Damages as a result of and in connection with such inaccuracy or breach.

**9.2.    Indemnification.**

(a)      From and after the Closing, Seller shall hold harmless and indemnify each of the Indemnitees from and against, and shall compensate and reimburse each of the Indemnitees for, any Damages which are suffered or incurred by any of the Indemnitees or to which any of the Indemnitees may otherwise become subject (regardless of whether or not such Damages relate to any thirdparty claim) and which arise from or as a result of, or are connected with: (a) any inaccuracy in or breach of any representation or warranty of Way to Grow or Seller as of the date of this Agreement (without giving effect to any "Material Adverse Effect" or other materiality qualification or any similar qualification contained or incorporated directly or indirectly in such representation or warranty); (b) any inaccuracy in or breach of any representation or warranty of Way to Grow or Seller as if such representation and warranty had been made on and as of the Closing Date (except for such representations and warranties that address matters only as of a particular time, which need only be accurate as of such time) (without giving effect to any "Material Adverse Effect" or other materiality qualification or any similar qualification contained or incorporated directly or indirectly in such representation or warranty); (c) any breach of any covenant or obligation of Way to Grow or Seller set forth in this Agreement; (d) any Closing Indebtedness or Way to Grow Transaction Expenses, to the extent not accounted for in the determination of the Aggregate Consideration pursuant to this Agreement; and (e) (i) any Taxes of Way to Grow with respect to any Pre-Closing Tax Period or with respect to the portion of any Straddle Period ending on the Closing Date, to the extent not accounted for in the determination of the Aggregate Consideration pursuant to this Agreement, and (ii) the unpaid Taxes of any Person (other than Way to Grow) for which Way to Grow is liable as a transferee or successor, by Contract, or otherwise (including, for the avoidance of doubt, as a result of any tax grouping arrangements), to the extent such liability arises from an event occurring on or prior to the Closing Date; provided, however, that in no event shall such Damages be "double counted" for purposes of this Article 9.

(b)      From and after the Closing, Purchaser shall hold harmless and indemnify each of the Indemnitees from and against, and shall compensate and reimburse each of the Indemnitees for, any Damages which are suffered or incurred by any of the Indemnitees or to which any of the Indemnitees may otherwise become subject (regardless of whether or not such Damages relate to any thirdparty claim) and which arise from or as a result of, or are connected with: (a) any inaccuracy in or breach of any representation or warranty of Purchaser as of the date of this Agreement (without giving effect to any "Material Adverse Effect" or other materiality qualification or any similar qualification contained or incorporated directly or indirectly in such representation or warranty); (b) any inaccuracy in or breach of any representation or warranty of Purchaser as if such representation and warranty had been made on and as of the Closing Date (except for such representations and warranties that address matters only as of a particular time, which need only be accurate as of such time) (without giving effect to any "Material Adverse Effect" or other materiality qualification or any similar qualification contained or incorporated directly or indirectly in such representation or warranty); (c) any breach of any covenant or obligation of Purchaser set forth in this Agreement; (d) any Finders' Fee incurred by Purchaser prior to the Closing; and (e) (i) any Taxes of Purchaser with respect to any Pre-Closing Tax Period or with respect to the portion of any Straddle Period ending on the Closing Date and (ii) the unpaid Taxes of any Person (other than Purchaser) for which Purchaser is liable as a transferee or successor, by Contract, or otherwise (including, for the avoidance of doubt, as a result of any tax grouping arrangements); provided, however, that in no event shall such Damages be "double counted" for purposes of this Article 9.

43

**9.3.    Limitations**.

(a)      No party shall be required to make any indemnification payment pursuant to Section 9.02(a) or Section 9.02(b) for any inaccuracy in or breach of any of the representations and warranties, until such time as the total amount of all Damages (including the Damages arising from such inaccuracy or breach and all other Damages arising from any other inaccuracies in or breaches of any representations or warranties) that have been directly or indirectly suffered or incurred by any one or more of the Indemnitees, or to which any one or more of the Indemnitees has or have otherwise become subject, exceeds an amount equal to U.S. $100,000 (the "Deductible") in the aggregate (it being understood that if the total amount of such Damages exceeds the Deductible, then the Indemnitees shall be entitled to be indemnified against and compensated and reimbursed only for such Damages that are in excess of the Deductible).

(b)      Absent fraud or willful or intentional misrepresentation, the indemnification provisions contained in this Article 9 are intended to provide the sole and exclusive remedy following the Closing as to all Damages any Indemnitee may incur arising from or relating to this Agreement or the Transaction (it being understood that nothing in this Section 9.03(b) or elsewhere in this Agreement shall affect the parties' rights to specific performance with respect to the covenants referred to in this Agreement or to be performed after the Closing).

(c)      Payments by Seller or Purchaser, as applicable, in respect of any Damages shall be limited to the amount of any Damages that remain after deducting therefrom (1) any amounts actually received by such Indemnitee pursuant to the terms of the insurance policies (if any) covering such Damages (net of all deductibles, co-payments, retro-premium obligations and premium increases attributable thereto and all costs of collection of any such insurance proceeds) or (2) any Tax benefits actually realized by such Indemnitee.

(d)      Notwithstanding any other provision of this Agreement, the aggregate indemnification obligations of Seller under Section 9.02(a) shall not exceed 20% of the Cash Payment actually received by Seller hereunder plus 20% of the Payment Shares issued to the Seller, at a valuation of $2.00 per share (collectively, the "Seller Cap Limitation"); provided, however, that (i) in the event of breaches or inaccuracies with respect to Seller's Fundamental Representations the Seller Cap Limitation shall be one hundred percent (100%) of the Cash Payment actually received by Seller hereunder plus 100% of the Payment Shares issued to the Seller, at a valuation of $2.00 per share and (ii) the Seller Cap Limitation shall not apply to matters involving fraud.  In the event that the indemnification obligations owed by Seller pursuant to Section 9.02(a) are less than the amount of the applicable Seller Cap Limitation, such indemnification obligations shall first be satisfied by the applicable portion of the Cash Payment, and then, to the extent not fully satisfied, by the applicable portion of the Payment Shares.   For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, there shall be no indemnity available under Section 9.02(a) for any Taxes  attributable to any Tax period (or portion thereof) beginning after the Closing Date.

(e)      Notwithstanding any other provision of this Agreement, the aggregate indemnification obligations of Purchaser under Section 9.02(b) shall not exceed shall not exceed the amount of the Seller Cap Limitation (the "Purchaser Cap Limitation"); provided, however, that (i) in the event of breaches or inaccuracies with respect to Purchaser's Fundamental Representations the Purchaser Cap Limitation shall be one hundred percent (100%) of the Cash Payment actually received by Seller hereunder plus 100% of the Payment Shares issued to the Seller, at a valuation of $2.00 per share and (ii) the Purchaser Cap Limitation shall not apply to matters involving fraud.

**9.4.    Claims and Procedures**.

44

(a)      If at any time prior to the Expiration Date, Purchaser or Seller, as applicable, determines in good faith that any Indemnitee has a bona fide claim for indemnification pursuant to this Article 9, Purchaser or Seller, as applicable (the "Indemnified Party"), may deliver to the other party (the "Indemnifying Party") a certificate signed by Seller or any officer of Purchaser, as applicable (any certificate delivered in accordance with the provisions of this Section 9.04(a) an "Officer's Claim Certificate"):

(i)      stating that an Indemnitee has a claim for indemnification pursuant to this Article 9;

(ii)      to the extent possible, containing a good faith non-binding, preliminary estimate of the amount to which such Indemnitee claims to be entitled to receive, which shall be the amount of Damages such Indemnitee claims to have so incurred or suffered or could reasonably be expected to incur or suffer;

(iii)      specifying in reasonable detail (based upon the information then possessed by Purchaser) the material facts known to the Indemnitee giving rise to such claim; and

(iv)      no delay in providing such Officer's Claim Certificate prior to the Expiration Date shall affect an Indemnitee's rights hereunder, unless (and then only to the extent that) Seller is materially prejudiced thereby.

(b)      If the Indemnifying Party, in good faith, objects to any claim made by the Indemnified Party in any Officer's Claim Certificate, then the Indemnifying Party shall deliver a written notice (a "Claim Dispute Notice") to the Indemnified Party during the 30-day period commencing upon receipt by the Indemnifying Party of the Officer's Claim Certificate.  The Claim Dispute Notice shall set forth in reasonable detail the principal basis for the dispute of any claim made by the Indemnified Party in the Officer's Claim Certificate.  If the Indemnifying Party does not deliver a Claim Dispute Notice to the Indemnified Party prior to the expiration of such 30-day period, then each claim for indemnification set forth in such Officer's Claim Certificate shall be deemed to have been conclusively determined in the Indemnified Party's favor for purposes of this Article 9 on the terms set forth in the Officer's Claim Certificate.

(c)      If the Indemnifying Party delivers a Claim Dispute Notice, then the Indemnified Party and the Indemnifying Party shall attempt in good faith to resolve any such objections raised by the Indemnifying Party in such Claim Dispute Notice.    If the Indemnified Party and the Indemnifying Party agree to a resolution of such objection, then a memorandum setting forth the matters conclusively determined by the Indemnified Party and the Indemnifying Party shall be prepared and signed by both parties.

(d)      If no such resolution can be reached during the 45-day period following the Indemnified Party's receipt of a given Claim Dispute Notice, then upon the expiration of such 45-day period, either the Indemnified Party or the Indemnifying Party may bring suit to resolve the objection in accordance with Sections 10.07, 10.08 and 10.09. The decision of the trial court as to the validity and amount of any claim in such Officer's Claim Certificate shall be nonappealable, binding and conclusive upon the Indemnified Party and the Indemnifying Party, and the Indemnified Party and the Indemnifying Party shall act in accordance with such decision.   Judgment upon any award rendered by the trial court may be entered in any court having jurisdiction.

**9.5.    Defense of Third-Party Claims**.  Except as otherwise provided in Article 9, in the event of the assertion of any claim or the commencement by any Person of any Proceeding (whether against Seller, against Purchaser or against any other Person) with respect to which Seller or Purchaser, as applicable, may become obligated to hold harmless, indemnify, compensate or

45

reimburse any Indemnitee pursuant to this Article 9 (each, a "Claim"), the other party shall have the right, upon written notice to Seller or Purchaser, as applicable, within thirty (30) days of receipt of a Claim, to assume the defense and control of such Claim; provided that Seller or Purchaser, as applicable, shall be permitted to participate in such prosecution and defense and Purchaser or Seller, as applicable, will provide the other party reasonable access to all relevant information and documentation relating to the Claim and the prosecution and defense thereof. If the other party elects to so proceed with the defense of any such Claim:

(a)     Seller or Purchaser, as applicable, shall make available to the other party any documents and materials in its possession or control that may be necessary to the defense of such Claim, or, in the event the delivery of such documents and materials would (i) violate Applicable Law or (ii) breach a Contract or obligation of confidentiality owing to a third party or (iii) constitute a waiver of Seller's or Purchaser's, as applicable, attorney-client privilege, Seller or Purchaser, as applicable, shall provide summaries, excerpts or any other information in connection with such documents and materials to the maximum extent legally permissible and shall use reasonable efforts to assist and participate in such defense (at its own expense, which amount shall not constitute "Damages" of Seller or Purchaser, as applicable) as it relates to such materials and documents; and

(b)     The party assuming the defense of any such Claim shall not enter into settlement of any Claim without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed).

Each party shall give the other party prompt notice of the commencement of any such Claim against an Indemnitee; provided, however, that any failure to so notify shall not limit any of the obligations of Seller and Purchaser, as applicable, under this Article 9 (except to the extent such failure materially prejudices the defense of such Proceeding). Such notice shall describe the Claim in reasonable detail based upon the information then possessed by Purchaser or Seller, as applicable, include copies of all material written evidence thereof, and shall indicate the estimated amount, if reasonably practicable and to the extent known to Purchaser or Seller, as applicable, of the Damages that have been or may be sustained by the Indemnitee.

**9.6.     No Contribution**.  Seller shall not have, and shall not be entitled to exercise or assert (or attempt to exercise or assert), any right of contribution, right of indemnity or other right or remedy against Way to Grow in connection with any indemnification obligation or any other liability to which it may become subject under or in connection with this Agreement.

**9.7.     Exercise of Remedies by Indemnitees Other Than Purchaser.**  No Indemnitee (other than Purchaser or Seller, as applicable, or any applicable successor thereto or assign thereof) shall be permitted to assert any indemnification claim or exercise any other remedy under this Agreement unless Purchaser or Seller, as applicable (or any successor thereto or assign thereof), shall have consented to the assertion of such indemnification claim or the exercise of such other remedy.

10.

**Miscellaneous**

**10.1.     Notices**.  All notices, requests and other communications required or permitted under, or otherwise made in connection with, this Agreement, shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) upon confirmation of receipt when transmitted by facsimile transmission or email, (c) upon receipt after dispatch by registered or certified mail, postage prepaid or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

46

if to Purchaser, PSub1 or PSub2, to:

> Pur Hydroponic Solutions, Inc.
> 527 Molino Street, Suite 110
> Los Angeles, CA 90013
> Attention:  Richard Byrd, Executive Chairman
> Facsimile No.:
> Email: rick@purhydro.com

with a copy to (which shall not constitute notice):

> Lucosky Brookman LLP
> 101 Wood Avenue South, 5th Floor
> Iselin, NJ 08830
> Attention:  Joseph M. Lucosky, Managing Partner
> Facsimile No.:  (732) 395-4401
> Email:  jlucosky@lucbro.com

if to Seller, to:

> Corey Inniss
> Way to Grow, Inc.
> 3201 E Mulberry Street, Unit K
> Fort Collins, Colorado 80524
> Facsimile No.: (970) 674-3474
> Email: corey.inniss@waytogrow.net

with a copy to (which shall not constitute notice):

> Kendall, Koenig & Oelsner PC
> 2060 Broadway, Suite 200
> Boulder, CO 80302
> Attention: Carlos Cruz Abrams, Esq.
> Facsimile No.: (303) 672-0101
> Email: ccruz@kkofirm.com

or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto.

**10.2.    Remedies Cumulative; Specific Performance.**  As between the Seller, on the one hand, and the Purchaser and any of its respective Affiliates, on the other hand, the remedies, rights and obligations set forth in Section 9.02 will be the exclusive remedies, rights and obligations arising out of, relating to or resulting from this Agreement.

**10.3.    Amendments and Waivers.**

(a)       Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by each party against whom the waiver is to be effective.

47

(b)      No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

**10.4.    Expenses**.   Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement, including all third-party legal, accounting, financial advisory, consulting or other fees and expenses incurred in connection with the Transaction, shall be paid by the party incurring such cost or expense.

**10.5.    Disclosure Schedule References**.    The parties hereto agree that any reference in a particular Section of the Disclosure Schedule shall only be deemed to be an exception to (or, as applicable, a disclosure for purposes of) (i) the representations and warranties (or covenants, as applicable) of the relevant party that are contained in the corresponding Section of this Agreement and (ii) any other representations and warranties of such party that is contained in this Agreement, but only if the relevance of that reference as an exception to (or a disclosure for purposes of) such representations and warranties would be readily apparent to an individual who has read that reference and such representations and warranties.

**10.6.    Binding Effect; Benefit; Assignment**.

(a)      The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  Except with respect to Article 9, no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

(b)      No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that Purchaser may transfer or assign its rights and obligations under this Agreement, in whole or from time to time in part, to (i) one or more of their Affiliates at any time and (ii) Purchaser may assign this Agreement to an Affiliate, lender, acquirer, or successor of Purchaser or Way to Grow or in connection with a sale of all or substantially all of the assets of Purchaser without the consent of Seller or Way to Grow; provided that such transfer or assignment shall not relieve Purchaser of its obligations hereunder or enlarge, alter or change any obligation of any other party hereto or due to Purchaser.

**10.7.    Governing Law**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada, without giving effect to principles of conflicts of laws that would require the application of the laws of any other jurisdiction.

**10.8.    Jurisdiction**.   The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transaction shall be brought in any federal court located in the State of Nevada or any Nevada state court, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding brought in any such court has been brought in an inconvenient forum.   Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.   Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.01 shall be deemed effective service of process on such party.

48

**10.9.    Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**10.10.  Counterparts; Effectiveness**.    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by all of the other parties hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).   The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement.

**10.11.  Entire Agreement**.  This Agreement (including the Disclosure Schedule and Exhibits) constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

**10.12.  Severability**.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the Transaction is not affected in any manner materially adverse to any party.  Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transaction be consummated as originally contemplated to the fullest extent possible.

**10.13.  Time is of the Essence**.  Time is of the essence with respect to the performance of this Agreement.

[Signature Page Follows]

49

50

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first written above.

**PUR HYDROPONIC SOLUTIONS, INC.**

By: _____
    Name: Richard Byrd
    Title: Executive Chairman

**PUR MERGER SUB 1, INC.**

By: _____
    Name: Richard Byrd
    Title: President

**PUR MERGER SUB 2, INC.**

By: _____
    Name: Richard Byrd
    Title: President

**WAY TO GROW, INC.**

By: _____
    Name:
    Title:

_____
**COREY INNISS**, an individual

51

# EXHIBIT B

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is entered into by and between PUR Hydroponic Solutions, Inc. (the "Company") and James Blaha (the "Executive") as of December 30, 2015 ("Effective Date").

WHEREAS, the Company desires to employ the Executive as its President and Chief Executive Officer and the Executive desires to serve in such capacity on behalf of the Company.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the Company and the Executive hereby agree as follows:

1.  **Employment.**

    (a)    Term.  The initial term of this Agreement shall begin on the Effective Date, and shall continue for five years, unless sooner terminated (or termination of the Executive's employment occurs) by either party as set forth below.  The term of this Agreement shall thereafter automatically renew for periods of one-year unless Executive gives the Company written notice at least 1 year prior to the end of the then existing term or at least 60 days prior to the end of any one-year renewal period that the term of the Agreement shall not be further extended.  The period commencing on the Effective Date and ending on the date on which the term of the Agreement terminates is referred to herein as the "Term."

    (b)    Duties.  During the Term, the Executive shall serve as the President and Chief Executive Officer, with duties, responsibilities and authority commensurate therewith and shall report to the Board of Directors of the Company (the "Board").  Specifically, the Executive shall have overall responsibility for the general supervision of the affairs of the Company and have general management and control of the business and property in the ordinary course of its business.  The Executive shall have all powers and shall perform all duties incident to the office of President or Chief Executive Officer which may be required by law, and shall have such other powers and perform such other duties as may from time to time be assigned pursuant to the bylaws of the Company ("Bylaws") or by the Board of Directors.  In addition, the Executive shall have the power to sign and execute all deeds, mortgages, bonds, certificates, contracts and other instruments and obligations of the Company which may be authorized by the Board of Directors, subject to the Bylaws.

    (c)    Business Time.  During the Term, the Executive shall devote substantially all of their business time and attention to promote the business and affairs of the Company and its affiliated entities, and shall be engaged in other business activities only to the extent that such activities do not materially interfere or conflict with the Executive's obligations to the Company hereunder.  The foregoing shall not be construed as preventing the Executive from (1) serving on corporate, civic, educational, philanthropic or charitable boards or committees, and (2) managing personal investments.



2.    **Compensation**.

(a)    <u>Base Salary</u>.  During the Term, the Company shall pay the Executive a base salary ("<u>Base Salary</u>"), at the annual rate of $260,000, which shall be paid in installments in accordance with the Company's normal payroll practices.  The Executive's Base Salary shall be reviewed annually by the Board pursuant to the Board's normal performance review policies for senior executives and may be increased (but not decreased) from time to time as the Board deems appropriate.  To the extent any other employee of the Company is paid a base salary at an annual rate higher than the Executive's annual Base Salary, the Executive's Base Salary shall automatically be increased to an annual rate equal to such other employee's annual base salary.

(b)    <u>Annual Bonus</u>.

(i)    The Executive shall be eligible to receive quarterly and annual bonuses for each quarter and calendar year during the Term ("<u>Bonus</u>"), commencing with the 2016 year, based on the attainment of Adjusted EBITDA (as defined below), in accordance with the following calculations:

(1)    When the Company achieves quarterly Adjusted EBITDA of between $1.00 and $ 1,000,000, the Executive shall receive a quarterly Bonus of 5% of such quarterly Adjusted EBITDA;

(2)    When the Company achieves quarterly Adjusted EBITDA of between $1,000,001 and $2,500,000, the Executive shall receive a quarterly Bonus of 7% of such quarterly Adjusted EBITDA;

(3)    When the Company achieves quarterly Adjusted EBITDA of between $2,500,001 and $5,000,000, the Executive shall receive a quarterly Bonus of 8.5% of such quarterly Adjusted EBITDA; and

(4)    When the Company achieves quarterly Adjusted EBITDA greater than $5,000,000, the Executive shall receive a quarterly Bonus of 10% of such quarterly Adjusted EBITDA; and

(5)    When the Company achieves annual Adjusted EBITDA greater than $10,000,000, the Executive shall receive an additional Annual Bonus of 2% of such annual Adjusted EBITDA.

(ii)    For purposes herein, "<u>Adjusted EBITDA</u>" shall mean earnings of operating income before interest, taxes, depreciation and amortization, the components of which shall be calculated in accordance with generally accepted accounting principles (to the extent applicable) and as such components traditionally appear on the Company's audited financial statements, and shall exclude any and all expenses associated with (i) any share-based payment arising out of accretive acquisitions and/or executive compensation including, but not limited to, stock options, and other equity related compensation; (ii) any gain or loss related to derivative instruments; and (iii) any other cash or non-cash expenses reasonably approved by the Board.

(iii)    Any quarterly and/or annual bonus due to the executive in accordance with this Section 2(b) shall be paid within 30 days of the ending of the applicable period.

(c)    <u>Equity Compensation.</u>  During the Term, the Executive shall be eligible for such equity awards, at such times, in such amounts and on such terms as the Board shall determine from time to time in its sole discretion.

3.    **Retirement and Welfare Benefits**.  During the Term, the Executive shall be eligible to participate in the Company's health, life insurance, long-term disability, retirement and other welfare benefit plans and programs available to employees of the Company, pursuant to their respective terms and conditions.  Nothing in this Agreement shall preclude the Company or any affiliate of the Company from terminating or amending any generally applicable employee benefit plan or program from time to time after the Effective Date.

4.    **Personal Time Off ("PTO")**.  During the Term, the Executive is expected to work to achieve expected results and may work from any location he wishes, as long as it does not interfere with achieving results.  Therefore there will be no allotment of PTO allocated to the Executive.

5.    **Expenses**.  The Company shall reimburse the Executive for all reasonable travel (which does not include commuting) and other reasonable business expenses incurred by the Executive in the performance of his duties hereunder in accordance with such reasonable accounting procedures as the Company may adopt generally from time to time for executives.

6.    **Termination Without Cause; Resignation for Good Reason**.  The Company may terminate the Executive's employment at any time without Cause (as defined below).  In addition, the Executive may initiate a termination of employment by giving notice of intent to terminate for Good Reason (as defined below).  Upon termination by the Company without Cause or resignation by the Executive for Good Reason, the Executive shall be entitled to receive, in lieu of any payments under any severance plan or program for employees or executives, the following:

(a)    The Company will pay the Executive an amount equal to two times the sum of (x) the Executive's annual Base Salary and (y) the average of the last three Annual Bonuses paid to the Executive.  Payment shall be made in a lump sum payment on the 60th day following the termination date.

(b)    The Company will pay the Executive a pro rata Annual Bonus for the year in which the Executive's termination of employment occurs.  The pro rata Annual Bonus shall be determined by multiplying the full year Annual Bonus that would otherwise have been payable to the Executive, based upon the achievement of the applicable performance objectives, as determined by the Board, by a fraction, the numerator of which is the number of days during which Executive was employed by the Company in the calendar year in which his termination occurs and the denominator of which is 365.  The pro rata Annual Bonus, if any, shall be paid at the same time as bonuses are paid to other employees of the Company, but not later than March 15 after the end of the year in which the termination date occurs.

7.     **Termination for Cause**.   The Company may terminate the Executive's employment at any time for Cause upon written notice to the Executive, in which event all payments under this Agreement shall cease, except for any amounts earned, accrued and owing but not yet paid under Section 2 above and any benefits accrued and due under any applicable benefit plans and programs of the Company.

8.     **Disability**.   If the Executive incurs a Disability (as defined below) during the Term, the Company may terminate the Executive's employment on or after the date of Disability.  If the Executive's employment terminates on account of his Disability, the Executive shall be entitled to receive (a) the payments set forth in Sections 6(a) and (b) above at the times set forth therein and (b) any amounts earned, accrued and owing but not yet paid under Section 2 above and any benefits accrued and due under any applicable benefit plans and programs of the Company.

9.     **Death**.   If the Executive dies during the Term, the Executive's employment shall terminate on the date of death and the Company shall pay to the Executive's executor, legal representative, administrator or designated beneficiary, as applicable, (a) the payments set forth in Sections 6(a) and (b) above at the times set forth therein and (b) any amounts earned, accrued and owing but not yet paid under Section 2 above and any benefits accrued and due under any applicable benefit plans and programs of the Company.  Otherwise, the Company shall have no further liability or obligation under this Agreement to the Executive's executors, legal representatives, administrators, heirs or assigns or any other person claiming under or through the Executive.

10.     **Resignation of Positions**.   Effective as of the date of any termination of employment, the Executive will resign all Company-related positions, including as an officer and director of the Company and its parents, subsidiaries and affiliates (excluding, for the avoidance of doubt, Blue Chip Holdings, LLC and any other entity wholly-owned by Executive through which Executive beneficially owns equity interests in the Company).

11.     **Definitions**.   For purposes of this Agreement, the following terms shall have the following meanings:

(a)     "Cause" shall mean the Board's finding of Executive's (1) willful and material breach of this Agreement that is not cured within 60 days after written notice to the Executive from the Board; (2) willful commission of fraud, embezzlement or theft that causes material harm to the Company; or (3) willful failure to comply with material and reasonable Company policies that is not cured within 60 days after written notice to the Executive from the Board.   For purposes of determining Cause, no act or omission by the Executive shall be considered "willful" unless the Board determines that it is done or omitted in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company.  Any act or failure to act based upon: (a) authority given pursuant to a resolution duly adopted by the Board, or (b) advice of counsel for the Company, shall be conclusively presumed to be done or omitted to be done by the Executive in good faith and in the best interests of the Company.

  (b) "Good Reason" shall mean the occurrence of one or more of the following without the Executive's written consent:

    (i) A material diminution by the Company of the Executive's authority, duties or responsibilities;

    (ii) Any action or inaction that constitutes a material breach by the Company of this Agreement, including the failure to pay any amounts due to Executive under Section 2;

    (iii) Any action or inaction that results in a material reduction in Executive's base compensation or bonus, or

    (iv) The Company elects not to renew the Term of the Agreement at the end of the Term pursuant to Section 1(a) above for any reason other than Cause and does not offer the Executive continued employment on substantially similar terms as set forth in this Agreement.

  The Executive must provide written notice of termination for Good Reason to the Company within 60 days after the event constituting Good Reason. The Company shall have a period of 60 days in which it may correct the act or failure to act that constitutes the grounds for Good Reason as set forth in the Executive's notice of termination. If the Company does not correct the act or failure to act, the Executive's employment will terminate for Good Reason on the first business day following the Company's 60-day cure period.

  (c) The term "Disability" shall mean the incurrence of a medical condition by the Executive rendering him unable to substantially perform his duties for the Company for a period of at least six (6) consecutive months.

  12. **Section 409A**.

  (a) This Agreement is intended to comply with section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and its corresponding regulations, or an exemption, and payments may only be made under this Agreement upon an event and in a manner permitted by section 409A of the Code, to the extent applicable. Severance benefits under the Agreement are intended to be exempt from section 409A of the Code under the "short-term deferral" exception, to the maximum extent applicable, and then under the "separation pay" exception, to the maximum extent applicable. Notwithstanding anything in this Agreement to the contrary, if required by section 409A of the Code, if the Executive is considered a "specified employee" for purposes of section 409A of the Code and if payment of any amounts under this Agreement is required to be delayed for a period of six months after separation from service pursuant to section 409A of the Code, payment of such amounts shall be delayed as required by section 409A of the Code, and the accumulated amounts shall be paid in a lump sum payment within ten days after the end of the six-month period. If the Executive dies during the postponement period prior to the payment of benefits, the amounts withheld on account of section 409A of the Code shall be paid to the personal representative of the Executive's estate within 60 days after the date of the Executive's death.



(b)      All payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" under section 409A of the Code. For purposes of section 409A of the Code, each payment hereunder shall be treated as a separate payment and the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments. In no event may the Executive, directly or indirectly, designate the calendar year of a payment.   Notwithstanding any provision of this Agreement to the contrary, in no event shall the timing of the Executive's execution of the Release, directly or indirectly, result in the Executive designating the calendar year of payment of any amounts of deferred compensation subject to section 409A of the Code, and if a payment that is subject to execution of the Release could be made in more than one taxable year, payment shall be made in the later taxable year.

(c)      All reimbursements and in-kind benefits provided under the Agreement shall be made or provided in accordance with the requirements of section 409A of the Code, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in kind benefits to be provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

13.    **Inventions Assignment**.  The Executive agrees that all inventions, innovations, improvements, developments, methods, designs, and all related information which relates to the Company's or its Affiliates' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by Executive while employed by the Company ("Work Product") belong to the Company.  The Executive will promptly disclose material Work Product to the Board and perform all actions reasonably requested by the Board (whether during or after the Term) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorneys and other instruments).  If requested by the Company, the Executive agrees to execute any inventions assignment and confidentiality agreement that is required to be signed by Company employees generally.

14.    **Return of Company Property**.   Upon termination of the Executive's employment with the Company, the Executive will deliver to the person designated by the Company all originals and copies of all documents and property of the Company or an Affiliate that is in the Executive's possession, under the Executive's control or to which the Executive may have access.  The Executive will not reproduce or appropriate for the Executive's own use, or for the use of others, any property, Proprietary Information or Work Product.

15.    **No Mitigation or Set Off**.  In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and such amounts shall not be reduced, regardless of whether the Executive obtains other employment.  The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including, without limitation, any set-off,

counterclaim, recoupment, defense or other right which the Company may have against the Executive or others.

16.    **Application of Section 280G.**  In the event that it shall be determined that any payment or distribution in the nature of compensation (within the meaning of section 280G(b)(2) of the Code to or for the benefit of Executive, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (a "Payment"), would constitute an "excess parachute payment" within the meaning of section 280G of the Code, the aggregate present value of the Payments under the Agreement shall be reduced (but not below zero) to the Reduced Amount (defined below), provided that the reduction shall be made only if the Accounting Firm (described below) determines that the reduction will provide the Executive with a greater net after-tax benefit than would no reduction.  The "Reduced Amount" shall be an amount expressed in present value which maximizes the aggregate present value of Payments under this Agreement without causing any Payment under this Agreement to be subject to the Excise Tax (defined below), determined in accordance with section 280G(d)(4) of the Code.  The term "Excise Tax" means the excise tax imposed under section 4999 of the Code, together with any interest or penalties imposed with respect to such excise tax.   Payments under this Agreement shall be reduced on a nondiscretionary basis in such a way as to minimize the reduction in the economic value deliverable to the Executive.  Where more than one payment has the same value for this purpose and they are payable at different times they will be reduced on a pro rata basis. Only amounts payable under this Agreement shall be reduced pursuant to this paragraph.  All determinations to be made under this section shall be made by an independent certified public accounting firm selected by the Company and agreed to by the Executive prior to the Change in Control (the "Accounting Firm"), which shall provide its determinations and any supporting calculations both to the Company and the Executive within ten days of the Change in Control.  Any such determination by the Accounting Firm shall be binding upon the Company and the Executive.  All of the fees and expenses of the Accounting Firm in performing the determinations referred to in this paragraph shall be borne solely by the Company.

17.    **Notices.**  All notices and other communications required or permitted under this Agreement or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when (i) hand delivered, (ii) sent by overnight carrier, (iii) mailed by registered or certified mail or (iv) sent by email (in which case, with an additional copy sent by registered or certificated mail), as follows (provided that notice of change of address shall be deemed given only when received):

If to the Company, to:

PUR Hydroponic Solutions, Inc.
527 Molina Street, Suite 110
Los Angeles, California 90013
Attn:  President

If to the Executive, to the most recent address on file with the Company or to such other names or addresses as the Company or the Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

18.   **Withholding**.  All payments under this Agreement shall be made subject to applicable tax withholding, and the Company shall withhold from any payments under this Agreement all federal, state and local taxes as the Company is required to withhold pursuant to any law or governmental rule or regulation.

19.   **Remedies Cumulative; No Waiver**.  No remedy conferred upon a party by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under this Agreement or now or hereafter existing at law or in equity.  No delay or omission by a party in exercising any right, remedy or power under this Agreement or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by such party from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

20.   **Assignment**.  All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, except that the duties and responsibilities of the Executive under this Agreement are of a personal nature and shall not be assignable or delegable in whole or in part by the Executive. The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company, within 5 days of such succession, expressly to assume and agree to perform this Agreement in the same manner and to the same extent as the Company would be required to perform if no such succession had taken place and in such event, such successor shall be the "Company" for purposes if this Agreement.

21.   **Attorneys' Fees for Preparation of this Agreement**.  The Company shall pay for the attorneys' fees incurred by the Executive in connection with the preparation of this Agreement, up to a maximum of $2,000.

22.   **Indemnification; Liability Insurance**.  The Company shall indemnify and hold the Executive harmless to the fullest extent permitted by the laws of Company's state of organization or incorporation and the corporate documents, as each is in effect at the time, against and in respect of any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including advancement of reasonable attorney's fees), losses, and damages resulting from the Executive's performance of the Executive's duties and obligations with the Company.  The Executive will be entitled to be covered, both during and, while potential liability exists, by any insurance policies the Company may elect to maintain generally for the benefit of officers and directors of the Company against all costs, charges and expenses incurred in connection with any action, suit or proceeding to which the Executive may be made a party by reason of being an officer or director of Company in the same amount and to the same extent as the Company covers its other officers and directors.  These obligations shall survive the termination of the Executive's employment with the Company.

23.   **Entire Agreement**.  This Agreement sets forth the entire agreement of the parties hereto and supersedes any and all prior agreements and understandings concerning the

Executive's employment by the Company.  This Agreement may be changed only by a written document signed by the Executive and the Company.

24.    **Severability**.  If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.   If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

25.    **Section 162(m) of the Code**.  The Company and Executive agree that if the stock of the Company becomes publicly traded, the Company and Executive will agree to make any amendments to the Agreement that the Company or Executive reasonably deems necessary to allow performance-based compensation to qualify for the "qualified performance-based compensation" exception to section 162(m) of the Code.

26.    **Governing Law**.  This Agreement shall be governed by, and construed and enforced in accordance with, the substantive and procedural laws of the State of Nevada without regard to rules governing conflicts of law.

27.    **Counterparts**.  This Agreement may be executed in any number of counterparts (including facsimile counterparts), each of which shall be an original, but all of which together shall constitute one instrument.



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

**COMPANY**

By: _____

Name:  Richard Byrd

Title:  Executive Chairman

**EXECUTIVE**

Name:  James Blaha

# EXHIBIT C

## LOCK-UP AGREEMENT

This **LOCK-UP AGREEMENT** (the "Agreement") is made as of this 1st day of January, 2016, by and between Pur Hydroponic Solutions, Inc., a Nevada corporation (the "Company") and Corey Inniss, individually (the "Holder"), in connection with the Holder's ownership of shares of the Company's common stock (the "Common Stock").

## W I T N E S S E T H :

**WHEREAS**, on January 1, 2016, the Company issued 12,500,000 shares of its restricted Common Stock (the "Lock-Up Securities") to Holder (the "Restricted Stock Grant") in accordance with that Amended and Restated Agreement and Plan of Merger by and among the Company, Way to Grow, Inc., a Nevada corporation, Pur Merger Sub 1, Inc., a Nevada corporation, Pur Merger Sub 2, Inc., a Nevada corporation, and Holder, dated January 1, 2016.

**NOW THEREFORE**, for good and valuable consideration, the sufficiency and receipt of which consideration is hereby acknowledged, the Holder and the Company hereby agree as follows:

1.   Lock-Up Period.

The Holder agrees that, from the date hereof until the earlier of: (a) 4:00 p.m. Eastern Standard Time on January 1, 2017 and (b) the expiration of the lock-up period determined by the underwriters of the Company's initial public offering following the Company's initial public offering (such period, the "Lock-Up Period"), the Holder shall be subject to the lock-up restrictions set forth in Section 2 below.

2.   Lock-Up Restriction.

(a) Lock-Up.  During the Lock-Up Period, the Holder will not offer, sell, contract to sell, hypothecate or otherwise dispose of (or enter into any transaction which is designed to, or might reasonably be expected to, result in the sale, hypothecation or disposition (whether by actual or effective economic sale, hypothecation or disposition due to cash settlement or otherwise) by the Holder or any affiliate of the Holder or any person in privity with the Holder or any affiliate of the Holder), directly or indirectly, including the filing (or participation in the filing) of a registration statement with the U.S. Securities and Exchange Commission in respect of, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Securities Exchange Act of 1934, as amended, with respect to the Lock-Up Securities, unless such transaction is a Permitted Disposition (as defined below).

A "Permitted Disposition" shall include the following: (a) transfers of Lock-Up Securities to a trust for the benefit of the undersigned; (b) as a *bona fide* gift, by will or intestacy, or to a family member or trust for the benefit of a family member of the undersigned (for purposes of

this lock-up agreement, "family member" means James Blaha, Susan Inniss and any other relationship by blood, marriage or adoption, not more remote than first cousin); or (c) transfers of Lock-Up Securities to a charity or educational institution; provided that in the case of any transfer pursuant to the foregoing clauses (a), (b) or (c), (i) any such transfer shall not involve a disposition for value, (ii) each transferee shall sign and deliver to the Company a lock-up agreement substantially in the form of this lock-up agreement and (iii) no filing under Section 16(a) of the Exchange Act shall be required or shall be voluntarily made.

(b) Stop Orders.  The Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of any Lock-Up Securities of the Company held by the Holder in violation of this Agreement.  The Company agrees not to allow any transaction to occur that is inconsistent with this Agreement.

3.    Miscellaneous.

(a) At any time, and from time to time, after the signing of this Agreement, the Holder will execute such additional instruments and take such action as may be reasonably requested by the Company to carry out the intent and purposes of this Agreement.

(b) This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.   Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York.   The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based on forum non conveniens.  **The parties executing this Agreement and any other agreements referred to herein or delivered in connection herewith agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.**  The prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(c) Any and all notices or other communications given under this Agreement shall be in writing and shall be deemed to have been duly given on (i) the date of delivery, if delivered in person to the addressee, (ii) the next business day if sent by overnight courier, or (iii) three (3) days after mailing, if mailed within the continental United States, postage prepaid, by certified or registered mail, return receipt requested, to the party entitled to receive same, at his or its address set forth below:

If to the Company:

Pur Hydroponic Solutions, Inc.
527 Molino Street, Suite 110
Los Angeles, CA 90013
Tel No.: (213) 364-6916


With a copy to (which shall not constitute notice):

Lucosky Brookman LLP
101 Wood Avenue South, 5th floor
Iselin, NJ 08830
Attn: Joseph M. Lucosky, Esq.
Tel No.: (732) 395-4400

If to the Holder:

Corey Inniss
1516 West Mountain Avenue
Fort Collins, CO 80521
corey@waytogrow.net

With a copy to (which shall not constitute notice):

Kendall Koenig & Oelsner PC
2060 Broadway, Suite 200
Boulder, CO 80302
Attn: Carlos Cruz-Abrams
Tel No.: (303) 672-0105


(d) The restrictions on transfer described in this Agreement are in addition to and cumulative with any other restrictions on transfer otherwise agreed to by the Holder or to which the Holder is subject to by applicable law.

(e) This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

(f) This Agreement may be signed in counterparts and delivered by facsimile signature and delivered electronically.

(g) The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

*[-signature page follows-]*

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties hereto have executed this Agreement as of the day and year first above written.

**HOLDER:**

By: _____

**COREY INNISS, an individual**

**COMPANY:**

**PUR HYDROPONIC SOLUTIONS, INC.**

By: _____

Name:   Richard Byrd

Title:   Executive Chairman

4830-2301-7004, v. 1

# EXHIBIT D

## CLAWBACK AGREEMENT

This **CLAWBACK AGREEMENT** (the "Agreement") is made as of this 1st day of January, 2016 (the "Effective Date"), by and between Pur Hydroponic Solutions, Inc., a Nevada corporation (the "Company") and Corey Inniss, individually (the "Holder"), in connection with the Holder's ownership of shares of the Company's common stock (the "Common Stock").

## W I T N E S S E T H :

**WHEREAS**, on January 1, 2016, the Company issued 12,500,000 shares of its restricted Common Stock (the "Clawback Securities") to Holder (the "Restricted Stock Grant") in accordance with that Amended and Restated Agreement and Plan of Merger by and among the Company, Way to Grow, Inc., a Nevada corporation ("Way to Grow"), Pur Merger Sub 1, Inc., a Nevada corporation, Pur Merger Sub 2, Inc., a Nevada corporation, and Holder, dated January 1, 2016 (the "Merger Agreement").

**NOW THEREFORE**, for good and valuable consideration, the sufficiency and receipt of which consideration is hereby acknowledged, the Holder and the Company hereby agree as follows:

1.    Clawback Period.

The Holder agrees that, from the date hereof until 4:00 p.m. Eastern Standard Time on January 1, 2018 (such period, the "Clawback Period"), the Holder shall be subject to the clawback restrictions set forth in Section 2 below.

2.    Clawback Restriction.

(a)  Clawback.  During the Clawback Period, (i) if, on the first anniversary of the date of the Effective Date, the Company's revenues attributable to the Business (as defined in the Merger Agreement) acquired from Holder for the 12-month period ending on the last day of the month preceding the date of such first anniversary ("WTG Year 1 Revenues") are less than 90% of Way to Grow's revenues for the 12-month period ending on the last day of the month preceding the date hereof (using the same methodology in each instance), then 3,125,000 of the Clawback Securities shall be forfeited, and cancelled by the Company, as soon as practicable following the determination of the WTG Year 1 Revenues and the comparison; and (ii) if, on the second anniversary of the date hereof, the Company's revenues attributable to the Business acquired from Holder for the 12-month period ending on the last day of the month preceding the date of such second anniversary ("WTG Year 2 Revenues") are less than 90% of Way to Grow's revenues for the 12-month period ending on the last day of the month preceding the date hereof (using the same methodology in each instance), then 3,125,000 of the Clawback Securities shall be forfeited, and cancelled by the Company, as soon as practicable following the determination of the WTG Year 2 Revenues and the comparison; *provided, however*, if the employment of James Blaha is terminated by the

Company without Cause or by such employee for Good Reason (as such terms are defined in the Merger Agreement(s)), then, effective as of the date of such termination, the Clawback shall be of no further force or effect and the Clawback Securities shall no longer be subject to forfeiture.

(b) <u>Stop Orders</u>.  The Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of any Clawback Securities of the Company held by the Holder in violation of this Agreement.  The Company agrees not to allow any transaction to occur that is inconsistent with this Agreement.

3.    <u>Miscellaneous</u>.

(a) At any time, and from time to time, after the signing of this Agreement, the Holder will execute such additional instruments and take such action as may be reasonably requested by the Company to carry out the intent and purposes of this Agreement.

(b) This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.   Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based on forum non conveniens. **The parties executing this Agreement and any other agreements referred to herein or delivered in connection herewith agree to submit to the in personam jurisdiction of such courts and hereby irrevocably waive trial by jury.**  The prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs.   In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(c) Any and all notices or other communications given under this Agreement shall be in writing and shall be deemed to have been duly given on (i) the date of delivery, if delivered in person to the addressee, (ii) the next business day if sent by overnight courier, or (iii) three (3) days after mailing, if mailed within the continental United States, postage prepaid, by certified or registered mail, return receipt requested, to the party entitled to receive same, at his or its address set forth below:

If to the Company:

Pur Hydroponic Solutions, Inc.
527 Molino Street, Suite 110
Los Angeles, CA 90013
Tel No.: (213) 364-6916

With a copy to (which shall not constitute notice):

Lucosky Brookman LLP
101 Wood Avenue South, 5th floor
Iselin, NJ 08830
Attn: Joseph M. Lucosky, Esq.
Tel No.: (732) 395-4400

If to the Holder:

Corey Inniss
1516 West Mountain Avenue
Fort Collins, CO 80521
corey@waytogrow.net

With a copy to (which shall not constitute notice):

Kendall Koenig & Oelsner PC
2060 Broadway, Suite 200
Boulder, CO 80302
Attn: Carlos Cruz-Abrams
Tel No.: (303) 672-0105

(d) The restrictions on transfer described in this Agreement are in addition to and cumulative with any other restrictions on transfer otherwise agreed to by the Holder or to which the Holder is subject to by applicable law.

(e) This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

(f) This Agreement may be signed in counterparts and delivered by facsimile signature and delivered electronically.

(g) The Company agrees not to take any action or allow any act to be taken which

would be inconsistent with this Agreement.

*[-signature page follows-]*

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties hereto have executed this Agreement as of the day and year first above written.

**HOLDER:**

By: _____

**COREY INNISS, an individual**

**COMPANY:**

**PUR HYDROPONIC SOLUTIONS, INC.**

By: _____

Name:   Richard Byrd

Title:   Executive Chairman

4830-2301-7004, v. 1

# EXHIBIT E

# SECURED
# PROMISSORY NOTE

January 1, 2016                                                                    **US$22,500,000**
Los Angeles, CA

**FOR VALUE RECEIVED,** PUR HYDROPONIC SOLUTIONS, INC, a corporation incorporated under the laws of the State of Nevada and located at 527 Molino Street, #110, Los Angeles, CA 90013 (the "Company"), hereby promises to pay to the order of COREY INNISS, an individual residing at 1516 West Mountain Ave., Fort Collins, CO 80521, and his successors or assigns (the "Holder"), the principal amount of Twenty Two Million Five Hundred Thousand United States Dollars (US$22,500,000) (the "Principal") upon the earlier of the following: (i) the date on which the Company closes on an equity financing in an amount that is not less than Forty Million United States Dollars (US$40,000,000); and (ii) December 31, 2016 (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of nine percent (9.0%) per annum or the maximum rate permissible by law, whichever is less (the "Applicable Rate") in accordance with the terms hereof. This Secured Promissory Note (this note, together with all modifications, extensions, future advances, supplements, and renewals thereof, and any substitutions therefor, the "Note") shall be payable in accordance with the terms set forth below.

This Note is delivered by the Company to the Holder pursuant to that certain Amended and Restated Agreement and Plan of Merger and Reorganization, dated as of January 1, 2016 (the "Merger Agreement"), by and among the Company, Pur Merger Sub 1, Inc., a Nevada corporation and a wholly owned subsidiary of the Company, Pur Merger Sub 2, Inc., a Nevada corporation and a wholly owned subsidiary of the Company, Way to Grow, Inc., a Colorado corporation and the Holder.  Except as otherwise defined herein, terms defined in the Merger Agreement shall have the same meaning when used herein.

1.      Payments of Principal and Interest.

(a)      Payment of Principal. If not sooner paid, all principal and unpaid interest on this Note shall be due and payable to the Holder on the earlier to occur of (i) the Maturity Date or (ii) an Event of Default (as defined below).

(b)      Payment of Interest. Interest on the unpaid principal balance of this Note shall accrue at the Applicable Rate, commencing on January 1, 2016.  The Company shall make monthly payments of interest to the Holder, while this Note is outstanding, commencing on January 29, 2016 and continuing on the last Business Day of each subsequent month until the Maturity Date.  Interest shall be computed on the basis of a 365-day year and paid for the actual number of days elapsed.

(c)    <u>General Payment Provisions</u>. All payments of principal and interest on this Note shall be made in lawful money of the United States of America by immediately available funds or wire transfer to such account as the Holder may designate by written notice to the Company in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding Business Day. For purposes of this Note, "Business Day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the State of New York are authorized or required by law or executive order to remain closed.

(d)    <u>Payment of Late Fees</u>. The Company shall pay to Holder a late charge of five percent (5%) of any payment not received by Holder within five (5) days after such payment is due; provided however, that no late charge shall apply so long as James Blaha is Chief Executive Officer of the Company.

2.    <u>Prepayment</u>. The Company shall have the right to prepay, without premium or penalty, at any time or times after the date hereof, all or any portion of the outstanding principal balance of this Note, together with accrued interest on the principal amount prepaid.

3.    <u>Automatic Maturity Date Extension</u>. The Holder and the Company agree that, in the event that the Company has not obtained sufficient EBITDA (as such term is defined by U.S. Generally Accepted Accounting Principles) to obtain debt financing from a credible lending institution at customary market rates and customary terms and conditions on or prior to the Maturity Date in such an amount equal to or exceeding the Principal amount (such a debt financing in such an amount, a "<u>Debt Financing</u>"), the Maturity Date shall be automatically extended until such time as a Debt Financing occurs. If applicable pursuant to this Section or the date of closing of the Debt Financing, as applicable, shall be the "Maturity Date". Notwithstanding the foregoing, the Company and the Holder may extend the Initial Maturity Date by mutual written consent.

3.    <u>Security Agreement</u>.

(a)    As security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all obligations of the Company, now existing or in the future, arising in connection with this Note (the "<u>Obligations</u>"), the Company, Green Door Hydro & Solar Electric, Inc., a corporation incorporated under the laws of the State of California and located at 1335 Willow St, Los Angeles, CA 90013, and Way to Grow, Inc., a corporation incorporated under the laws of the State of Colorado and located at 3201 E Mulberry Street, Unit K, Fort Collins, CO 80524 (together the "<u>Subsidiaries</u>" and, each a "<u>Grantor</u>" and together with the Company, each in their respective capacities as grantors pursuant to this Section, collectively, the "<u>Grantors</u>") do hereby pledge, assign, transfer, deliver and grant to Secured Party a continuing and unconditional security interest in and to any and all

property and assets of Grantors, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, including, without limitation, the following (all of which property for Grantors, along with the products and proceeds therefrom, are individually and collectively referred to as the "Collateral"): (a) all property of, or for the account of, Grantors now or hereafter coming into the possession, control or custody of, or in transit to, Secured Party or any agent or bailee for Secured Party or any parent, affiliate or subsidiary of Secured Party or any participant with Secured Party in the Obligations (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all cash, earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; (b) the additional property of Grantors, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, and all of Grantors' books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of Grantors' right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media; (c) all Accounts and all goods whose sale, lease or other disposition by Grantors has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Grantors, or rejected or refused by any person who is or who may become obligated under, with respect to, or on an Account ("Account Grantor"); (d) all Inventory, including raw materials, work-in-process and finished goods; (e) all goods (other than Inventory), including embedded software, Equipment, vehicles, furniture and Fixtures; (f) all Software and computer programs; (g) all Securities, Investment Property, Financial Assets and Deposit Accounts; (h) all Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Health-Care-Insurance Receivables, Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles; (i) all real estate property owned by Grantors and the interest of Grantors in fixtures related to such real property; and (j) all Proceeds (whether Cash Proceeds or Non-cash Proceeds) of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.  Grantors authorize Secured Party to prepare and file or cause to be filed such financing statements, amendments and other documents and do such acts as Secured Party deems necessary in order to establish and maintain valid, attached and perfected, security interests in the Collateral in favor of Secured Party, free and clear of all Liens and claims and rights of third parties whatsoever.  Grantors hereby irrevocably authorize Secured Party at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral is comprised of all assets of Grantors (or words of similar effect), regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the UCC (as defined herein) of the jurisdiction wherein such financing statement or amendment is filed, and (b) contain any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Grantors are an organization, the type of organization, and (ii) in the case

of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates. Grantors agree to furnish any such information to Secured Party promptly upon request. Grantors hereby agree that a photogenic or other reproduction of this Security Agreement is sufficient for filing as a financing statement and Grantors authorize Secured Party to file this Security Agreement as a financing statement in any jurisdiction.

(b)     At any time and from time to time, upon the written request of Holder, at the sole expense of Grantors and Byrd, Grantors and Byrd shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Holder may reasonably deem necessary or desirable to perfect and continue perfected or better perfect Holder's security interest in the Collateral.

4.     <u>Guarantee Agreement</u>.   The Subsidiaries hereby jointly and severally guarantee and become surety to the Holder for the full, prompt and unconditional payment of the Obligations and payment and performance of the Obligations, and the full, prompt and unconditional performance of each term and condition to be performed by the Company in connection with this Note.  This guaranty is a primary obligation of the Subsidiaries and shall be a continuing inexhaustible guaranty.  This is a guaranty of payment and not of collection.  The Holder may require the Subsidiary to pay and perform its individual liabilities and obligations under this guaranty and may proceed immediately against any of the Subsidiaries without being required to bring any proceeding or take any action against any other Grantor prior thereto; the liability of the Subsidiaries hereunder being independent of and separate from the liability of any other Grantor and the availability of any Collateral.

5.     <u>Defaults and Remedies</u>.

(a)     <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "<u>Event of Default</u>" hereunder: (i) the Company fails to pay timely any interest, principal or other sums due under this Note within five (5) days of when any such payment becomes due and payable; (ii) the Company makes an assignment for the benefit of creditors or takes any corporate action in furtherance of the foregoing; (iii) any order or decree is rendered by a court which appoints or requires the appointment of a receiver, liquidator or trustee for the Company, and the order or decree is not vacated within sixty (60) days from the date of entry thereof; (iv) any order or decree is rendered by a court adjudicating the Company insolvent, and the order or decree is not vacated within sixty (60) days from the date of entry thereof; (v) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect or takes any corporate action in furtherance of any of the foregoing; (vi) a proceeding or petition in bankruptcy is filed against the Company and such proceeding or petition is not dismissed within ninety (90) days from the date it is filed; (viii) the Company files a petition or answer seeking reorganization or arrangement under the bankruptcy laws or any law or

statute of the United States or any other foreign country or state; (iv) the Company engages in any liquidation, dissolution or winding up; or (x) the Company fails to perform, comply with or abide by any of the stipulations, agreements, conditions and/or covenants contained in this Note on the part of the Company to be performed complied with or abided by, and such failure is not cured within thirty (30) days after written notice of such failure is delivered by Holder to the Company.

(b)     Remedies.  Upon the occurrence of one or more Events of Default, the Holder, at its option and without further notice, may make a demand or presentment for payment to the Company or others, may declare the then outstanding principal balance of this Note, together with all other sums due under the Note, immediately due and payable, together with all accrued and unpaid interest thereon, together with all reasonable attorneys' fees, paralegals' fees and costs and expenses incurred by the Holder in collecting or enforcing payment thereof (whether such reasonable fees, costs or expenses are incurred in negotiations, all trial and appellate levels, administrative proceedings, bankruptcy proceedings or otherwise), and all other sums due by the Company hereunder, all without any relief whatsoever from any valuation or appraisement laws and payment thereof may be enforced and recovered in whole or in part at any time by one or more of the remedies provided to the Holder at law, in equity, or under this Note.  Upon the occurrence and during the continuance of any Event of Default, interest shall thereafter accrue at the rate of twelve percent (12%) per annum.

6.     Expenses.  The Company agrees to pay all legal costs and expenses incurred by the Holder and the Company in connection with the preparation of this Note or the collection of amounts due or the enforcement of the Holder's security interest hereunder.

7.     Lost or Stolen Note.  Upon notice to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in a form reasonably acceptable to the Company and customary for similar circumstances in commercial lender/borrower circumstances, and, in the case of mutilation, upon surrender and cancellation of the Note, the Company shall execute and deliver a new Note of like tenor and date and in substantially the same form as this Note.

8.     Cancellation.  After all principal, accrued interest and all other sums at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be re-issued.

9.     Governing Law.  This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the laws of the State of Nevada, without giving effect to provisions thereof regarding conflict of laws.  Each party hereto hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in the State of Nevada for the adjudication of any dispute hereunder or in connection herewith or with any transaction

contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper, provided, however, nothing contained herein shall limit the Holder's ability to bring suit or enforce this Note in any other jurisdiction. Each party hereto hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by sending by certified mail or overnight courier a copy thereof to such party at the address indicated in the preamble hereto and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

10.    <u>Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief</u>. The remedies of the Holder as provided herein shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

11.    <u>Specific Shall Not Limit General; Construction</u>.  No specific provision contained in this Note shall limit or modify any more general provision contained herein.  This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.

12.    <u>Failure or Indulgence Not Waiver</u>.  Holder shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Holder, and then only to the extent specifically set forth in the writing.  A waiver on one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

13.    <u>Notice</u>.  Notice shall be given to each party at the address indicated in the preamble hereto or at such other address as provided to the other party in writing.

14.    <u>Usury Savings Clause</u>.  Notwithstanding any provision in this Note, the total liability for payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions, or other sums which may at any time be deemed to be interest, shall not exceed the limit imposed by the usury laws of the jurisdiction governing this Note or any other applicable law.  In the event the total liability of payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions or other sums which may at any time be deemed to be interest, shall, for any reason whatsoever,

result in an effective rate of interest, which for any month or other interest payment period exceeds the limit imposed by the usury laws of the jurisdiction governing this Note, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice by, between, or to any party hereto, be applied to the reduction of the outstanding principal balance of this Note immediately upon receipt of such sums by the Holder hereof, with the same force and effect as though the Company had specifically designated such excess sums to be so applied to the reduction of such outstanding principal balance and the Holder hereof had agreed to accept such sums as a penaltyfree payment of principal; provided, however, that the Holder of this Note may, at any time and from time to time, elect, by notice in writing to the Company, to waive, reduce, or limit the collection of any sums in excess of those lawfully collectible as interest rather than accept such sums as a prepayment of the outstanding principal balance.  It is the intention of the parties that the Company does not intend or expect to pay nor does the Holder intend or expect to charge or collect any interest under this Note greater than the highest non-usurious rate of interest which may be charged under applicable law.

15.     Binding Effect.  This Note shall be binding upon the Company and the successors and assigns of the Company and shall inure to the benefit of Holder and the successors and assigns of Holder.

16.     Severability.  In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal, or unenforceable, in whole or in part, in any respect, or in the event that any one or more of the provisions of this Note operates or would prospectively operate to invalidate this Note, then and in any of those events, only such provision or provisions shall be deemed null and void and shall not affect any other provision of this Note.   The remaining provisions of this Note shall remain operative and in full force and effect and shall in no way be affected, prejudiced, or disturbed thereby.

17.     Assignment.   The Company may not transfer or assign this Note without the written consent of Holder.

18.     Amendments.   The provisions of this Note may be changed only by a written agreement executed by the Company and Holder.

*[Signature pages follows]*

**IN WITNESS WHEREOF,** the Company has caused this Note to be executed on and as of the date set forth above.

PUR HYDROPONIC SOLUTIONS, INC.

By: _____
Name:  Richard Byrd
Title:   Executive Chairman

**CONSENTED AND AGREED:**

The undersigned, referred to in the foregoing Note as a Grantor, hereby consents and agrees to said Note and to the payment of the amounts contemplated therein, documents contemplated thereby and to the provisions contained therein relating to conditions to be fulfilled and obligations to be performed by it pursuant to or in connection with said Note to the same extent as if the undersigned were a party to said Note.

**GREEN DOOR HYDRO & SOLAR ELECTRIC, INC.**

**By:**   **PUR HYDROPONIC SOLUTIONS, INC.**
**Its:**   **Sole Shareholder**

By: _____
Name:  Richard Byrd
Title:   Executive Chairman

**WAY TO GROW, INC.**

**By:**   **PUR HYDROPONIC SOLUTIONS, INC.**
**Its:**   **Sole Shareholder**

By: _____
Name:  Richard Byrd
Title:   Executive Chairman

*[ Signature page to Secured Promissory Note ]*